[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
{¶ 1} This matter comes before this court on appeal from an administrative appeal brought in the Franklin County Court of Common Pleas from an August 3, 2000 order of the State Medical Board of Ohio ("Board") permanently revoking appellant Clayton H. Royder, D.O.'s license to practice medicine. On November 30, 2001, the Court of Common Pleas affirmed the decision of the Board permanently revoking appellant's license to practice osteopathic medicine and surgery in Ohio. Appellant raises the following seven assignments of error:
{¶ 2} "[1.] The trial court erred when it affirmed the Medical Board's determination that Dr. Royder authorized Mr. Stewart to practice in a manner that violated the Physician Assistant Utilization Plan.
{¶ 3} "[2.] The trial court erred when it affirmed the Medical Board's determination that Dr. Royder aided and abetted Mr. Stewart in violating R.C. 4730.21(D).
{¶ 4} "[3.] The trial court erred when it affirmed the Medical Board's determination that Dr. Royder aided and abetted Mr. Stewart in violating Ohio Admin. Code 4731-4-03(A) (B).
{¶ 5} "[4.] The trial court erred when it affirmed the Medical Board's determination that Dr. Royder aided and abetted Mr. Stewart in violating Ohio Admin. Code 4731-4-03(C).
{¶ 6} "[5.] The trial court erred when it affirmed the Medical Board's determination that Dr. Royder aided and abetted Mr. Stewart in violating R.C. 4731.43.
{¶ 7} "[6.] The trial court erred when it affirmed the Medical Board's determination that Dr. Royder was complicit in the trafficking of drugs.
{¶ 8} "[7.] The trial court erred when it failed to determine the appropriate sanction upon appeal."
{¶ 9} Clayton H. Royder, D.O. ("Royder") graduated from the Texas College of Osteopathic Medicine in 1986. In 1987, he completed an internship in Columbus, Ohio, at Doctors Hospital. After completing that internship, he remained in Columbus, eventually purchasing four medical clinics from Dr. Bernard Master, D.O. In December 1990, Royder purchased the "Town Street Medical Clinic," and in March 1996, the "Cleveland-Morse Clinic" from Dr. Master. Later, in March 1997, Royder purchased Dr. Master's "Master Family Clinic," and the "East Main Street Clinic."
{¶ 10} Royder testified that he was the sole shareholder of a corporation which owned and operated the clinics, and that everyone who worked at the clinics, including the physicians and physician assistants, had been his employee. He also testified that he maintained the ultimate authority to decide where his employees would work and published monthly work schedules setting forth the hours to be worked by each employee.
{¶ 11} On April 14, 1999, the Board notified Royder that it proposed to take disciplinary action against his certificate to practice osteopathic medicine. The Board's action was based upon allegations that Royder had violated the terms of a supervision agreement governing the practice of one of Royder's employees, a physician assistant by the name of Scott Stewart.
{¶ 12} In 1996, Dr. Master hired Scott Stewart, P.A. ("Stewart"), to work as a physician assistant at the Master Family Clinic. Stewart had been educated as a physician assistant at the Kettering College of Medical Arts in Dayton, Ohio, and had served as a medic in the United States Army prior to completing his degree. He was certified by the Ohio State Medical Board as a physician assistant in December 1996 and became Royder's employee and assistant when Royder purchased the Master Family Clinic and the East Main Street Clinic in 1997.
{¶ 13} In its notification letter, the Board alleged the following:
{¶ 14} "(1) You entered into a supervision agreement with Scott Thomas Stewart, P.A., effective on or about August 28, 1997. Pursuant to this supervision agreement, you certified that you would supervise Mr. Stewart in accordance with your Physician Assistant Utilization Plan * * * as approved by the Board. In part, the Utilization Plan required on-site supervision ninety-nine percent of the time, with the supervising physician available by beeper, telephone or cellular phone the one percent of the time when there was not on-site supervision; that new patients be seen only when the supervising physician was on-site; and that both new patients and established patients with new conditions be personally seen and evaluated by the supervising physician prior to the initiation of treatment.
{¶ 15} "(a) Contrary to the requirements of the Utilization Plan, you assigned Mr. Stewart to practice without on-site supervision on the following dates in 1998: April 6, 7, 9, 10 and 24; May 8, 13, 15, 19 and 29; June 3, 4, 5, 8, 9, 10, 16, 17, 19, 24, 25, 26, 29 and 30; July 1, 2, and 3; and December 9, 28, 29, and 30. * * *
{¶ 16} "(b) Contrary to the requirements of the Utilization Plan, you failed to provide on-site supervision when Mr. Stewart examined new patients * * * [.]
{¶ 17} "* * *
{¶ 18} "(c) Contrary to the requirements of the Utilization Plan, you failed to personally see and evaluate * * * [several] patients, even though these established patients presented with new conditions and Mr. Stewart examined, diagnosed and treated these patients * * * without on-site supervision:
{¶ 19} "* * *
{¶ 20} "(2) You authorized Mr. Stewart to issue prescriptions to patients for controlled substances and other prescription drugs in such a manner that Mr. Stewart authorized these prescriptions without your or any other physician's specific approval."
{¶ 21} According to the Board, the allegations set forth in the notification letter constituted the following:
{¶ 22} "* * * `[c]ommission of an act that constitutes a misdemeanor in this state regardless of the jurisdiction in which the act was committed, if the act was committed in the course of practice,' as that clause is used in Section 4731.22(B)(12), Ohio Revised Code, as in effect prior to March 9, 1999, to wit: Section 4730.02(E), Ohio Revised Code. Pursuant to Section 4730.99, Ohio Revised Code, violation of Section 4730.02, Ohio Revised Code, constitutes a misdemeanor offense.
{¶ 23} "* * * `[f]ailure of a physician supervising a physician assistant to maintain supervision in accordance with the requirements of Chapter 4730. of the Revised Code and the rules adopted under that chapter,' as that clause is used in Section 4731.22(B)(32), Ohio Revised Code, to wit: Section 4730.21(D), Ohio Revised Code.
{¶ 24} "* * * `violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of, or conspiring to violate, any provisions of this chapter or any rule promulgated by the board,' as that clause is used in Section 4731.22(B)(20), Ohio Revised Code, to wit: Rule 4731-4-03(A) and (B) [and (C)], Ohio Administrative Code.
{¶ 25} "* * *
{¶ 26} "* * * `[c]ommission of an act that constitutes a felony in this state regardless of the jurisdiction in which the act was committed,' as that clause is used in Section 4731.22(B)(10), Ohio Revised Code, to wit: Section 2923.03, Ohio Revised Code, Complicity, to wit: Section 2925.03, Trafficking in drugs, Ohio Revised Code.
{¶ 27} "Further your acts, conduct, and/or omissions * * * individually and/or collectively, constitute `[c]omission of an act that constitutes a felony in this state regardless of the jurisdiction in which the act was committed,' as that clause is used in Section4731.22(B)(10), Ohio Revised Code, to wit: Section 2923.03, Ohio Revised Code, Complicity, to wit: Section 2925.23, Ohio Revised Code, Illegal processing of drug documents."
{¶ 28} Prior to, as well as during the hearing of this matter, the following evidence and testimony was elicited. Stewart testified that Royder operated his clinics from 9 a.m. to 6 p.m. and allowed his employees one hour to eat lunch. He further testified that approximately 80 to 120 patients were seen daily at the Master Family Clinic, between 60 and 100 at the Town Street Medical Clinic, between 80 and 100 at the East Main Street Clinic, and between 5 and 15 patients at the Cleveland-Morse Clinic. Similarly, Royder testified that in 1998, between 100 and 150 patients were seen daily at the Master Family Clinic, between 60 and 80 at the Town Street Medical Clinic, between 15 and 20 at the East Main Street Clinic, and perhaps only five at the Cleveland-Morse Clinic.
{¶ 29} In addition to himself, Royder employed two physicians to work full time at his clinics, Dr. Emmart Hoy, Jr., D.O., and Dr. Ernesto Perez, M.D. At Royder's hearing, Dr. Hoy testified that he had been responsible for patient care only, and that he had no managerial responsibilities regarding the practice, including any authority or control over the scheduling of physicians or physician assistants.
{¶ 30} During the course of the hearing, Ms. Cathy Hacker testified on behalf of the Board. Ms. Hacker testified that she is the Physician Assistant Program Administrator for the Board. Ms. Hacker explained that in Ohio, a physician assistant practices under the supervision of a physician or a group of physicians. She also explained that a physician assistant's practice and the level of physician supervision for each physician assistant is governed by a standard Physician Assistant Utilization Plan ("Utilization Plan"), which is always filed with and approved by the Board. Specifically, each plan must be individually reviewed and approved by the Board before a physician assistant may practice, and an assistant may thereafter practice only in accordance with an approved plan. Although modifications to approved plans are at times granted by the Board, any deviation from an approved plan must be set forth either in a separately approved supplemental utilization plan or by an approved request to modify the original standard plan.
{¶ 31} In Royder's case, Stewart's utilization plan was originally filed in September 1996 by Dr. Benjamin Kelch, on behalf of the Master Family Practice. However, the record contains an undated letter written by Mona Royder, Royder's wife, which advised the Board that the Town Street Medical Clinic, had been purchased by Royder and would be assuming the plan filed by the Master Family Practice. The Board approved Royder's request, effective in August 1997.
{¶ 32} R.C. 4730.21(D) requires that "[a] patient new to a supervising physician's practice or an established patient with a new condition must be seen and personally evaluated by a supervising physician prior to initiation of any treatment plan." Accordingly, Stewart's plan set forth the following strict guidelines for his practice as Royder's physician assistant:
{¶ 33} 1. All patients new to the practice will be seen by the physician assistant only when a supervising physician is physically on the premises.
{¶ 34} 2. All patients new to the practice will be seen and personally evaluated by a supervising physician prior to the initiation of any treatment by the physician assistant.
{¶ 35} 3. All established patients with new conditions will be seen and personally evaluated by a supervising physician prior to the initiation of any treatment by the physician assistant.
{¶ 36} 4. The physician assistant will refer the patient to the supervising physician whenever the physician assistant identifies a new condition.
{¶ 37} 5. The physician assistant will refer the patient to the supervising physician whenever the patient is not responsive to treatment.
{¶ 38} 6. The physician assistant will only institute and change orders on patient charts as directed by the supervising physician.
{¶ 39} 7. The physician assistant will sign each order and record the date and time that the order is written.
{¶ 40} 8. The form on which the physician assistant's order is written must clearly identify the supervising physician.
{¶ 41} 9. Each medical order written by the physician assistant will be reviewed by a supervising physician twenty-four (24) hours after the order is written and the physician will countersign that order if the order is appropriate.
{¶ 42} 10. The physician assistant will carry out or relay the supervising physician's order for medication, to the extent permitted under laws pertaining to drugs.
{¶ 43} 11. The physician assistant will see no more than 25 patients per day.
{¶ 44} 12. The physician assistant will be supervised by a physician on-site ninety-nine percent of the time.
{¶ 45} Stewart's utilization plan also specifically provided that:
{¶ 46} "* * * [t]he supervising physician be continuously available for direct communication with the physician [assistant] by either being physically present at the location where the physician assistant will be practicing or readily available by some means of telecommunication and being in a location that under normal conditions is not more than sixty minutes travel time away from the location where the physician assistant is practicing."
{¶ 47} In April 1998, Royder sent a letter to the Board requesting that Stewart be permitted to work alone when a supervising physician was out of the office or on vacation for either one-half or full day. In that letter, Royder stated that Stewart would be within a twenty-minute drive of at least two or three supervising physicians and would be in direct fax or phone contact concerning each patient. He stated that no new patients or new patient problems would be seen, and proposed that after each history and chief complaint, Stewart would document all physical findings and make appropriate recommendations. Then, he would fax "chart notes" to an "off-site supervising physician," who would review and authorize any medical treatment. The physician would fax back the chart notes to Stewart, who would then carry out the physician's orders. Royder concluded his request with "[p]lease let us know the boards [sic] decision on this request."
{¶ 48} At the hearing, Royder claimed that he had telephoned Ms. Hacker to discuss the propriety of allowing Mr. Stewart to practice without on-site supervision, and that when he presented the plan to Ms. Hacker, she had stated that Royder's plan was "okay with her." Royder further claimed that Ms. Hacker had "no reservations, absolutely no doubt in her mind, that there was any problem" with anything that I was asking. (Tr. at 654-656, 672.) In light of this claim, when questioned why he had sent the letter, Royder testified that he had done so because he did not fully understand the requirement for 99 percent on-site supervision. In his words, he claimed to have contacted the Board ``as an advocate" and ``as a friend of the physician" to get the Board's "input" regarding the issue of expanding the amount of time a physician assistant could practice without on-site supervision. When asked why he had sent the letter if Ms. Hacker had approved his plan, Royder testified that he had only sent the letter because Ms. Hacker had encouraged him to do so. (Tr. at 653-656, 666-667, 672.)
{¶ 49} Conversely, Ms. Hacker testified that she interpreted the 99 percent supervision requirement to require that Stewart be supervised by an on-site physician 99 percent of each day. (Tr. at 36-38, 89.) Ms. Hacker also denied having discussed the proposed plan with Royder. When questioned, Ms. Hacker stated that when she received Royder's letter, she had interpreted it as a request to change the requirement that supervision of any physician assistant employed by Royder's practice be on-site 99 percent of the time. Accordingly, Ms. Hacker had presented Royder's request to the Board. Indeed, the Board considered Royder's request in May 1998. At that time, some members suggested that Royder was asking permission for the physician assistant to practice independently. Accordingly, the matter was placed on the agenda for the June 1998 Board meeting.
{¶ 50} At the June 1998 Board meeting, during a lengthy discussion, the Board members questioned whether Royder's proposed plan could be implemented while maintaining the provision for on-site supervision 99 percent of the time. Therefore, on July 2, 1998, the Board sent a letter to Royder requesting additional specific information. That letter also included a copy of the minutes of the Board's June 10, 1998 discussion regarding his request and the members' concerns about the request. However, Royder chose not to respond to the Board's request for clarification. When asked why he had not responded, Royder claimed that he did not do so because he "did not really have [any] intention of changing [his] plan." When asked why he had written the April 1998 letter if he had not wanted to change his plan, Royder claimed that he had simply wanted clarification of his existing plan. (Tr. at 658-660.) He then denied that he had made a request for a change and claimed that he did not expect a response from the Board, despite the fact that in his letter he specifically asked to be informed of the Board's decision. Royder later "clarified" his testimony, asserting that he had intended to ask the Board whether it was "permissible" to use Stewart in the manner he had described. He then admitted that he had, in fact, been waiting for an answer from the Board, and that when he received the July letter, he had been "really confused." He stated that he had not known what to do and decided that "maybe [he] should stop asking [the Board] questions." (Tr. at 661-667.)
{¶ 51} During the course of the hearing, it became evident that Royder had allowed Stewart to practice without on-site supervision as early as April 1998. When presented with the explicit requirement that Stewart be supervised by an on-site physician for 99 percent of the time, Royder claimed that, in order to calculate the 99 percent requirement for on-site supervision, he had taken "the total volume of patients that [Stewart] was seeing * * * over the calendar year and factored it into the volume. * * * If [Stewart] were to see 100 patients, then one of those patients could be seen unsupervised." When questioned further, Royder claimed to have made these calculations on a monthly basis, but at "random intervals" and had not kept any notes or charts evidencing the analysis he had used. He also testified that he had made the calculations based on a standard calendar year. Once he had made a calculation as to how many patients Stewart had seen while he was supervised, he would determine the number of patients Stewart could see unsupervised. Then, he would hold that number in reserve for a time when he needed to use Stewart in an unsupervised situation.
{¶ 52} However, after testifying that he had made these calculations on a yearly basis, Royder admitted that he had not made any calculations for 1997. When asked how he had determined the number of patients Stewart could see without on-site supervision in 1998 if he had not made any calculations in 1997, Royder then stated that he had made the calculations on a monthly basis. In any event, Royder could not recall the number of patients Stewart had seen in January, February and March of 1998, prior to working unsupervised on five days in April 1998. He also admitted that if Stewart had seen five patients on each of the unsupervised days in April, by his calculations, Stewart had seen a total of 2,500 patients on supervised days between January and March of that year. At that rate, Stewart would have seen approximately 35-40 patients per day if he had worked five or six days per week from January to March 1998. In the end, Royder testified that he was unable to demonstrate how he made his calculations in determining that by December 30, 1998, Stewart still had not practiced in an unsupervised manner more than one percent of the 1998 year, claiming that the information he needed to make the calculations was no longer available to him. Specifically, he maintained that the information was kept by his billing company in a computer, and that the billing company routinely erased its computer files. When questioned further about this claim, Royder admitted that he did not know if such recent information would have been destroyed.
{¶ 53} The record demonstrates that beginning in April 1998, Royder started scheduling Stewart to practice at his clinics without on-site supervision by a physician. Royder testified that his justification for scheduling Stewart to work alone was that he was operating four locations but had only three physicians available to work on those days. Specifically, the parties stipulated that during 1998, Stewart practiced without on-site supervision as follows:
{¶ 54} April 6 Some part of the day
{¶ 55} April 7 Some part of the day
{¶ 56} April 9 Some part of the day
{¶ 57} April 10 Some part of the day
{¶ 58} April 24 Some part of the day
{¶ 59} May 8 During the afternoon
{¶ 60} May 13 Some part of the day
{¶ 61} May 15 All day
{¶ 62} May 19 All day
{¶ 63} May 29 During the afternoon
{¶ 64} June 10 During the afternoon
{¶ 65} June 17 All day
{¶ 66} June 19 During the afternoon
{¶ 67} June 24 During the afternoon
{¶ 68} June 26 All day
{¶ 69} June 29 All day
{¶ 70} June 30 All day
{¶ 71} July 1 All day
{¶ 72} July 2 All day
{¶ 73} July 3 All day
{¶ 74} December 9 All day
{¶ 75} December 28 All day
{¶ 76} December 29 All day
{¶ 77} December 30 During the morning.
{¶ 78} The parties further stipulated that Royder was out of town on the following dates in 1998: June 3 through June 9; June 17 and 18; June 26 through July 4, and December 9.
{¶ 79} Royder explained that when Stewart practiced without on-site supervision, a supervising physician reviewed his entries and countersigned them. He explained that this supervision was accomplished by facsimile. Royder explained his "fax supervision," as follows:
{¶ 80} "We use a protocol of faxing the chart to the supervising physician at the time of the patient visit by Scott Stewart, and the physician, supervising physician, would then countersign that visit, review that visit, countersign that visit, refax that back to him, and then he would review that. * * * Scott Stewart would basically review the return fax, okay that return fax. If there are any changes, put those on the chart. That fax was then inserted into the chart. It was set aside in a different area of the clinic. Then when that physician was at that location his next time, he would countersign the original chart and remove the fax." (Tr. at 631-632.)
{¶ 81} However, Royder was forced to admit that there were numerous occasions when he was out of town, and when Stewart was practicing without supervision, that his initials were the only physician initials in the patient charts. Royder rationalized that on those occasions, he had signed the entry as the medical director rather than as a supervising physician. As noted by the hearing examiner, Stewart examined "Patient 2" at the Cleveland-Morse Clinic on June 30, 1998, while working without supervision. While Stewart claimed that Dr. Perez had been his supervising physician, the patient's medical record contains no record or faxed copy signed by Dr. Perez. It did, however, have an entry signed by Royder, despite the fact that Royder had been out of town on that date. According to Stewart, Royder had explained to him that he had reviewed the charts "to see what was going on."
{¶ 82} The evidence adduced at Royder's hearing also showed that there were numerous instances where Stewart was practicing without on-site supervision, when Royder was working at another clinic, and also when Royder's initials were the only physician initials in the entry. Royder claimed that on those occasions he had signed the medical record as a "supervising physician," rather than as a "medical director." Royder attempted to explain the apparent discrepancy, stating that he could be sure that his signature was that of a supervising physician, rather than of a medical director, because that is the protocol in his clinics. When questioned, Royder had the following to say:
{¶ 83} "[Ms. Strait]: On 5-19-98, [patient 15] was seen again, and this is one of the dates the parties stipulated Mr. Stewart was seeing patients all day without on-site supervision; however, there is no fax in the chart [and] your initials are at the bottom of this page. So when would you have initialed this?
{¶ 84} "[Royder]: This would have been initialed when I reviewed the chart and removed the fax.
{¶ 85} "[Examiner]: How do you know you didn't initial this part as the medical director?
{¶ 86} "[Royder]: Because I signed the fax.
{¶ 87} "* * *
{¶ 88} "[Examiner]: What fax?
{¶ 89} "[Royder]: The fax that's gone.
{¶ 90} "[Examiner]: How do you know you signed a fax?
{¶ 91} "[Royder]: Because [Stewart] faxed every visit by our protocol.
{¶ 92} "[Examiner]: You told me earlier, though, that there were some charts that you just signed as a medical director, and that signature looked a lot like this signature. There's no distinction by the signature.
{¶ 93} "[Royder]: Correct.
{¶ 94} "* * *
{¶ 95} "[Examiner]: * * * [T]here were entries of Mr. Stewart's similar to this where * * * your initials were on that chart, [and] you knew they were only there because you were the medical director and not the supervising physician. I don't see any difference between that chart and this chart, so I'm asking how you know on this chart that these initials indicate you were the supervising physician rather than a medical director?
{¶ 96} "[Royder]: I guess clarity would be that the supervising physician needs to sign off on every chart within 24 hours. If I did this, say a week later, reviewed and signed off on this pile of charts that was set in a different area —
{¶ 97} "[Examiner]: How do you know when you signed this?
{¶ 98} "[Royder]: What I'm stating —
{¶ 99} "[Examiner]: Just tell me, how do you know when you signed this?
{¶ 100} "[Royder]: I would have had to sign this at a different time because I was not physically there on this day.
{¶ 101} "[Examiner]: I understand that. How do I know you signed this at a different time as a supervising physician rather than as a medical director?
{¶ 102} "[Royder]: By looking at the chart, you don't know. But I'm stating by our protocol that every chart was faxed, and we would review them and remove the fax from the chart.
{¶ 103} "[Examiner]: We had a previous chart where your signature was the only physician signature on a page where Scott Stewart saw the patient * * *and there was no fax. You testified that you knew that you had signed that chart as a medical director and not a supervising physician. That would be contrary to the protocol that your [sic] now saying, or at least you're relying on that protocol to tell me now, that you know how this was done. But in that chart you didn't rely on the protocol and came to the alternative conclusion. I'm not sure how — I don't understand why in some cases you can rely on protocol and in some cases you don't.
{¶ 104} "[Royder]: I am not trying to confuse you. Please stop me. I'm trying to distinguish between it was very clear to see if you were on site with the PA —
{¶ 105} "[Examiner]: In neither case were you on site.
{¶ 106} "[Royder]: No.
{¶ 107} "[Examiner]: I'm telling you in both of these situations, you were not on site.
{¶ 108} "[Royder]: Correct.
{¶ 109} "[Examiner]: All right.
{¶ 110} "[Royder]: That they would be signed off by fax at the time of the visit, as we previously discussed. The next time I personally was at that facility, which possibly was one week later, I would review this pile of charts.
{¶ 111} "[Examiner]: As a supervising physician?
{¶ 112} "[Royder]: At that time, as the medical director, because it was not within the 24-hour window. I would look at those charts. If there were charts with my name on them, I would then be making a duplicate signature as the supervising physician, but if it was one of Dr. Perez' charts or Dr. Hoy's chart, I would then sign it as the medical director, remove their fax from the chart and discard that.
{¶ 113} "[Examiner]: Whether or not [the supervising physician] had signed the original chart entry?
{¶ 114} "[Royder]: Correct.
{¶ 115} "[Examiner]: So for all you know, then, this could have been Dr. Perez' supervising visit — Dr. Perez could have been the supervising physician on this visit. He did not sign Mr. Stewart's entry. You came along a week later, signed the chart and threw away his fax. Is that what you are saying?
{¶ 116} "[Royder]: Theoretically, that's true.
{¶ 117} "[Examiner]: So on any occasion where there's no fax but there is your signature, we have no idea who the supervising physician was?
{¶ 118} "[Royder]: If I was out of town —
{¶ 119} "[Examiner]: We didn't' say you were out of town. You said you were at another facility.
{¶ 120} "[Royder]: Then this answer is yes." (Tr. 718-724.)
{¶ 121} Royder also explained that he had destroyed the supervising physicians' original signed fax copies because he "didn't like all that duplicate paper in the chart." (Tr. at 720, 725.) However, he was forced to acknowledge that the law requires the medical record to be signed by the physician within 24 hours of the patient having been seen by a physician assistant. In doing so, he testified that his decision to throw away the supervising physician's signature had been a "mistake in judgment." He also admitted that the faxed copy signed by the supervising physician had not really been "duplicate paper" because it was the only document which contained the signature of the supervising physician. (Tr. at 1060-1061.)
{¶ 122} The evidence confirms that Royder was on vacation from June 26 through July 4, 1998. (Joint Exhibit 1.) Prior to leaving for vacation, Royder assigned Dr. Emmart Hoy to work the Master Family Clinic, Dr. Perez to work the Town Street Medical Clinic, and a Dr. Tina Frangowlakis-Dennis to work the East Main Street Clinic. Stewart was assigned to work the Cleveland-Morse Clinic, although Royder testified that he had not assigned either Dr. Hoy or Dr. Perez to supervise Stewart. (Tr. at 1057-1058.)
{¶ 123} According to Stewart, on June 26, 29, and 30, as well as on July 1, 2, and 3, 1998, he had been assigned to practice at the Cleveland-Morse Clinic without on-site supervision, although he claimed that Dr. Perez, who had been at the Town Street Medical Clinic, had been his "off-site" supervising physician. (Tr. at 282-283.) Nevertheless, the only physician signature on any of the entries for patients seen by Stewart during this time is that of Royder. At the hearing, Royder testified that he had reviewed and signed all of the records, not as a supervising physician, but as a medical director. That testimony contradicted Royder's previous testimony given in a February 1999 deposition, at which time he claimed that he had signed an entry for a patient seen by Stewart on July 2, 1998, as Stewart's supervising physician. (Tr. at 630-638; State Exhibit 127, at 171-172.)
{¶ 124} However, when confronted with this statement at the hearing, Royder testified that he could not have been Stewart's supervising physician on that day because he had been out of town. Royder was also forced to admit that the entry contains no indication that any other physician had been Stewart's supervising physician on that date. When asked if he had an explanation as to why the entries for patients seen by Stewart during that time contained his signature and not the signature of Dr. Perez, Royder responded by repeating his facsimile protocol for supervising Stewart's practice. When the question was repeated, Royder testified that he did not know why the entries were not signed by Dr. Perez or Dr. Hoy. (Tr. at 630-634, 638.) He later claimed that, when he returned from vacation, he had reviewed the medical records as medical director to make sure that his protocols had been followed and that the standard of care had been met. He then allegedly countersigned the entries and removed the faxes from the medical record. Royder testified that he specifically remembers removing faxed copies with Dr. Perez' signatures and throwing those faxes in the trash. Royder explained that he had not felt it necessary to have both the fax copy with Dr. Perez' initials as well as his. (Tr. at 1000.)
{¶ 125} Dr. Hoy testified that he never supervised Stewart when he was working at a location other than the location where Dr. Hoy was working. (Tr. at 379, 414.) Dr. Hoy also testified that he had a conversation with Stewart regarding supervision and had advised Stewart that he would only be responsible for Stewart when Stewart was actually in the building with Dr. Hoy. (Tr. at 379, 414-416, 464.)
{¶ 126} Dr. Hoy further testified that, shortly after Royder left for vacation in June 1998, he was advised that he would be responsible for supervising Stewart while Stewart practiced at a different location. Dr. Hoy objected to the plan and attempted to contact Royder. However, he could not do so because the office manager had refused to give him a phone number where Royder could be reached. (Tr. at 380-384.) Dr. Hoy stated that he had made an anonymous call to the Board to inquire if Stewart's utilization plan allowed him to work with off-site supervision. When he was advised that it did not, Dr. Hoy presented a letter to the Board announcing his resignation from the supervision of Stewart. (Tr. at 384-386, 464; State Exhibit 115, at 41.) Despite this, Dr. Hoy testified that on July 1, 1998, he was given a stack of medical records for patients Stewart had seen on the previous two days. He was then asked to sign the entries as Stewart's supervising physician for those days. Dr. Hoy testified that Stewart had not contacted him regarding any of those patients. Moreover, Dr. Hoy stated that he had not authorized Stewart to issue any prescriptions or medications to patients. As a result, Dr. Hoy refused to countersign the medical records and left Royder's employ shortly thereafter. (Tr. at 386-388.)
{¶ 127} Dr. Perez also testified that he did not remember ever supervising Stewart when Stewart was working at a location other than the location at which Dr. Perez was working. He further stated that, if it did happen, Dr. Perez had not known anything about it. Dr. Perez added that he does not remember ever signing an entry for Stewart for a patient Stewart had seen as a patient at another location. (Tr. at 505-508, 550.) He also stated that he did not supervise Stewart between June 26 and July 3, 1998, and that he had signed an affidavit to this effect that had been prepared by a Board staff member. (Tr. at 508, 512, 521-534; State Exhibit 126.) On March 23, 1999, Dr. Perez also wrote a letter to the Board in which he stated that he was unable to supervise Stewart from another location, and that as of the date of the letter, he would no longer serve as his physician monitor. (State Exhibit 115, at 51.)
{¶ 128} Stewart testified that, on some Friday afternoons in the fall of 1998, Royder had left the clinic to attend his daughter's soccer games before all of the patients had been treated. Royder testified that, in the fall of 1998, his daughter had played soccer on Friday evenings. On these evenings, he left the clinic early to attend these games. On a number of occasions, Royder left Stewart alone at the Town Street Medical Clinic. (Tr. at 678-679.) Stewart testified that from Monday, December 28, through Wednesday, December 30, 1998, he had practiced at the East Main Street Clinic, and that no physician had supervised him on those dates. (Tr. at 135; 206-207.) However, Royder testified that he had been working at the Town Street Medical Clinic and had served as Stewart's supervising physician for the patients Stewart saw on those days. (Tr. at 644.)
{¶ 129} Mr. Kevin Beck, an Enforcement Investigator with the Board, participated in the investigation of Royder's clinics. Mr. Beck visited the East Main Street Clinic on December 30, 1998, accompanied by David Katko, an attorney employed by the Board. (Tr. at 845-849; 870.) When he visited the clinic, Mr. Beck met with Stewart and completed a Physician Assistant Utilization Inspection Report, which is used by the Board during an investigation of physician assistant matters. During this inspection, Mr. Beck asked Stewart a series of questions, and Mr. Beck recorded Stewart's answers. (Tr. at 849-851, 871; State Exhibit 143.)
{¶ 130} Mr. Beck testified that he had reviewed a number of medical records for patients who had been seen by Stewart between December 28 and December 30, 1998. Mr. Beck stated that, for many of the patients, there had been no signature of a physician and no fax copy in the medical record. Moreover, Mr. Beck testified that Stewart had told him that he had spoken with Royder only two or three times that week. (Tr. at 854-855, 859, 866.)
{¶ 131} The Board alleged that on June 26, 1998, Stewart examined two patients who were new to Royder's practice, and that those patients had not been seen or examined by a physician. The Board also maintains that in December 1998, Stewart initiated treatment for two additional patients, who were also new to Royder's practice, and who also had not been seen by a physician. (State Exhibit 114A.)
{¶ 132} Royder testified that he did not allow Stewart to see new patients. (Tr. at 626-627.) According to Royder, if Stewart was practicing at a site without on-site supervision, and a patient needed to see a physician, there had been a courier named "Alex" who could be contacted by beeper or possibly a cellular phone, and who would transfer the patient between clinics. Royder stated that Alex no longer works at the clinics. (Tr. at 626-627.) Tellingly, Stewart did not mention that any individual had been available to transfer patients if needed. Ms. Dasheena Whitfield, a medical assistant at the Town Street Medical Clinic, testified that she was not aware that Alex had ever transported patients between clinics. (Tr. at 958.)
{¶ 133} The evidence showed that on June 26, 1998, Stewart was practicing without on-site supervision when he performed a physical examination and completed a form presented by patient 48. The record indicates that patient 48 paid $30 for this service. (State Exhibit 48, at 1B, 3A, 4.) The form completed by Stewart contains a "Physician's Statement," which includes the following language: "I examined the individual named above, and to the best of my knowledge he/she has no health condition that would create the inability to perform * * * ." The form also requested the signature of the health professional under the physician's statement and the health professional's title. Stewart signed Royder's name followed by Stewart's initials. Stewart also wrote "Family Practitioner," followed by Royder's physician registration number. (Tr. at 323-325; State Exhibit 48 at 3A, 4.)
{¶ 134} On June 26, 1998, patient 92 presented to the Cleveland-Morse Clinic for the first time while Stewart was practicing without on-site supervision. Patient 92 requested a physical examination for employment purposes, which Stewart performed, and patient 92 presented a form, which Stewart completed. At the bottom of the form, there is a line requesting the signature of the physician. Stewart signed Royder's name, followed by his own initials. According to Stewart, patient 92 was not a new patient, despite the fact that he had never been to the clinic before, as patient 92 had not presented with medical complaints, but had only requested a physical examination. Stewart further reasoned that a patient who presents simply for a physical examination should not be considered a "patient," because a person requesting a work physical is not making a commitment to return to the clinic. When asked why he had signed Royder's name on the physical form if he believed that there was no need for a physician to see a person requesting only a physical examination, Stewart stated that he had done so to indicate that the examination had been performed in Royder's office. He maintained this position despite the fact that the form asks for a physician's signature, rather than the name of the office. (Tr. at 358.) Nevertheless, at the hearing, Stewart explained that the clinic's policy provided that the physician assistant could see an established patient who presented with a new condition, even if no physician was practicing on-site with the physician assistant. In addition, Mr. Beck testified that Stewart had admitted that he had been treating patients with new conditions. (Tr. at 176, 855-856; State Exhibit 143.)
{¶ 135} Stewart also examined patient 11. This patient arrived at the Cleveland-Morse Clinic on December 29, 1998, with complaints of a runny nose, slight chest congestion, and cold symptoms. A medical assistant recorded vital signs, a past medical history, a past surgical history, a family medical history, a social history, and allergies. The medical record also contains a history sheet completed by the patient and dated December 29, 1998. In addition, patient 11 supplied insurance information dated December 29, 1998. (State Exhibit 11 at 2-6.) There was no physician at the Cleveland-Morse Clinic that day; however, Stewart examined patient 11 anyway and diagnosed bronchitis. He then prescribed two medications, Claritin D and Z-pack. (State Exhibit 11 at 3A.)
{¶ 136} Patient 13 was treated at the Cleveland-Morse Clinic on December 28, 1998, with complaints of clogged ears, congestion, and coughing. The medical assistant recorded vital signs, a past medical history, a past surgical history, a family medical history, current medications, and allergies. Stewart testified that he had treated patient 13 on December 28, 1998, and that no physician had been practicing with him that day. Nevertheless, Stewart prescribed Augmentin, Claritin D, and Nasonex. (Tr. at 173-176; State Exhibit 13 at 3A.)
{¶ 137} Royder claimed that patient 13 was not a new patient because the record prepared on that date was a temporary chart, which proved that the office staff had not been able to locate the old chart. Royder further testified that, when a new patient is seen at the clinics, the entry is distinguishable from entries for established patients. Royder maintained that the entry for a new patient should contain the past family history, past surgical history, past medical history, and social habits of the patient. Royder acknowledged that the entries for patients 11 and 13 contain all of these things. Nevertheless, he maintained that the entries for patients 11 and 13 are not new patient entries because the entries are only half as formal as an entry for a new patient should be. When asked for clarification, Royder stated that the entry would be more orderly, concise and expanded. He further stated that the entry would not be as sloppy as those for patients 11 and 13. Royder also stated that every new patient received a urinalysis, but then retracted that statement. (Tr. at 706-709.)
{¶ 138} On the seventh day of the hearing, Royder presented what he identified as additional medical records for patient 13. Royder acknowledged that he had promised to look for any additional records nearly one year earlier, but stated that the record had been misfiled until January 2000. (Tr. at 1048-1053; Royder Exhibit B.) Coincidently, the newly discovered medical record contained an entry for December 28, 1998, written and signed by Royder. That entry indicated that Royder examined patient 13 on that date and diagnosed bronchitis.
{¶ 139} Royder testified that his policy at the clinic was that a physician assistant could not see established patients who presented with new conditions. Royder explained that a new condition is a medical condition that has not been previously treated at one of his medical facilities. Nevertheless, on numerous occasions, Royder testified that he did not know the meaning of the word "condition." At one point, Royder testified that "a medical diagnosis is a diagnosis that is made by a doctor on an ongoing basis of a medical problem that potentially can be wrong and potentially can be — those diagnoses can culminate into the proper diagnosis, which I would then define as the medical condition." (Tr. at 1001.) He later opined that "condition" is not a medical term used by physicians, that it could not be found in medical text books or journals, and that it is not a word used in the medical community. Despite this testimony, Royder was forced to admit that a condition is the state of being that a physician diagnoses. Finally, Royder concluded that a patient might have "multiple diagnoses added together to make the final diagnosis of the patient, which is their true condition." (Tr. at 1033-1046.)
{¶ 140} On June 30, 1998, while Royder was out of town, Stewart examined patient 4, an established patient to Royder's practice, at the Cleveland-Morse Clinic. No other physician was practicing at the Cleveland-Morse Clinic that day. (Tr. at 287-288; State Exhibit 4 at 4A.) Patient 4 complained of low back pain for two days and a fever of over 100 degrees. Stewart acknowledged that this was a new condition for patient 4 and that no physician saw patient 4 prior to commencement of treatment. Stewart examined patient 4 and diagnosed a urinary tract infection. He then prescribed Trovan. There is an "S" in the medical record next to the medication, followed by Stewart's initials. Stewart explained that the "S" indicates that sample medications were given to patient 4. The entry is countersigned by Royder, but there is no indication that Dr. Perez reviewed the entry. (Tr. at 237-238, 262, 287-288, 290-291; State Exhibit 4 at 4A.)
{¶ 141} Patient 4 returned on July 1, 1998. Stewart again saw the patient and diagnosed a urinary tract infection and possible pyelonephritis. Stewart ordered an injection of Unasyn and Tigan. This order was initialed by the medical assistant. According to Stewart, the initials meant that the injections had been administered. Although Royder had not yet returned from his vacation, his signature is the only physician signature in the entry. (Tr. at 289-290; State Exhibit 4 at 4A.)
{¶ 142} Royder opined that the urinary tract infection had not been a new condition. He reasoned that in December 1997, when patient 4 first presented to his office, she had completed a patient history form. On that form, patient 4 indicated that she had had problems with urinary frequency and urgency. In his February 1999 deposition, however, Royder acknowledged that Stewart had treated a new condition on June 30, 1998. During the deposition, Royder did not mention patient 4's complaints of frequency and urgency six months earlier. (State Exhibit 128, at 149-150.)
{¶ 143} Another established patient, patient 7, was seen by Stewart on December 9, 1998. Patient 7 reported that the previous day he had fallen approximately 15 feet from a tree and had landed directly on his back. He complained of sharp lumbar pain. Stewart admitted that this was a new condition. Stewart examined the individual and diagnosed dorsal lumbar contusion. He recommended x-rays and an anti-inflammatory medication, Daypro. He then wrote a school excuse and excused the patient from gym class for one week. No physician examined patient 7. Moreover, there is no physician signature in the entry. (Tr. at 299-301, 304; State Exhibit 7 at 78.) Royder admitted that patient 7 had presented with a new condition and that no physician had seen patient 7 prior to initiation of treatment by Stewart. (Tr. at 640, 1064-1065.)
{¶ 144} Patient 8, an established patient, presented on July 2, 1998, complaining that she had been bitten by her dog the previous day. Stewart examined patient 8, diagnosed "dog bite," and prescribed Augmentin. The only physician's initials are Royder's, and he was on vacation at the time of this examination. (State Exhibit 8 at 238.)
{¶ 145} Stewart treated patient 10, an established patient, on July 2, 1998. No physician had seen patient 10 that day. Patient 10 was an 84-year-old female who complained of a cough for two days with various joint pains, and requested vitamins. After examining this individual, Stewart diagnosed organic heart disease, arteriosclerotic vascular disease, history of syncope, history of cerebral vascular accident, carotid bruits, cardiac murmur, degenerative joint disease bilateral knees and bronchitis. (Tr. at 307-308; State Exhibit 10 at 3B.) He then prescribed the medications Plavix, Daypro, vitamins, Robitussin DM, and Cefzil. The entry contains the initials of a medical assistant and the name of a pharmacy. Stewart admitted that the prescriptions had been called to the pharmacy. (Tr. at 307-308; State Exhibit 10 at 38.) This was confirmed by a pharmacist who testified that the medications ordered by Stewart had been prepared for dispensation by the pharmacy on July 2, 1998. (Tr. at 782-784; State Exhibit 130.) Royder testified that patient 10 had not presented with a new condition that day and that Stewart had erred when he listed an impression of bronchitis. According to Royder, patient 10's symptoms had been related to her previously diagnosed conditions of heart disease and syncope. (Tr. at 1003, 1065.)
{¶ 146} Stewart examined patient 17 on December 29, 1998, while practicing alone and unsupervised. (Tr. at 212; State Exhibit 17 at 6A.) Patient 17 complained of lower back pain after falling down a flight of steps two days earlier. Stewart examined patient 17 and diagnosed acute lumbosacral sprain and strain. He prescribed Daypro and Medrol dose pack and ordered physical therapy. (Tr. at 213-215; State Exhibit 17, at 6A.) Stewart admitted that this patient was an established patient presenting with a new condition; however, the entry contains no indication that a physician reviewed Stewart's orders. (Tr. at 215-217; State Exhibit 17, at 6A.) Despite Stewart's inability to determine whether his medication orders had been carried out, pharmacy logs indicate that the medication orders had been presented to the pharmacy. (Tr. at 651-652.)
{¶ 147} Royder responded claiming that he had been working at the Town Street Medical Clinic on December 29, 1998, and had served as the supervising physician for patients seen by Stewart. Royder acknowledged that no physician had countersigned Stewart's entry and that the medical record does not indicate that the entry had been faxed to a supervising physician. He was also forced to acknowledge that there was no indication that the patient had been transported to a clinic at which a physician was available. (Tr. at 643-644, 1078.) Nevertheless, Royder claimed that there is no indication that Stewart "treated" patient 17 that day. Royder explained that the medical assistant's initials for this entry do not appear next to the medication but, rather, next to the x-ray. Royder explained that an x-ray is not treatment, but part of the physical examination. He also claimed that there is no way to determine if this patient had received the medications ordered by Stewart. (Tr. at 645, 648.)
{¶ 148} Finally, Royder argued that despite the fact that Stewart had diagnosed patient 17 with acute lumbosacral strain after having fallen down a flight of stairs two days earlier, this individual had not presented with a new condition on December 29, 1998. He supported this claim arguing that when patient 17 first presented to his office in September 1998, he had complained of shoulder pain, and had completed a patient history sheet which indicated that he had had joint and rheumatic pain and that he "gets upset and tires easily."
{¶ 149} Stewart treated patient 19 on June 30, 1998. This individual complained of pain in the left ear and a sore throat for the past 2 days. He also complained of anxiety. Stewart performed an examination and diagnosed acute left otitis media, pharyngitis, and anxiety. He prescribed Amoxil, Zyrtec and Zoloft. The only physician signature in the entry is Royder's; however, Royder was out of town on vacation at that time. (State Exhibit 19, at 11 B; Joint Exhibit I.) Royder admitted that Stewart had treated a new condition when he saw patient 19 on June 30, 1998. (Tr. at 1079.)
{¶ 150} Stewart testified that he treated patient 20 on December 30, 1998. Patient 20 complained of sharp pain for the past two days. No physician saw patient 20 on this date. After his examination, Stewart diagnosed a urinary tract infection, diabetes, and hypertension. Stewart ordered Cipro to treat the urinary tract infection. Royder argued to the Board that this patient's complaints had been a symptom of her diabetes rather than that of a new condition. Royder asserted that it is common for diabetic patients to have recurrent bladder infections and that this patient had a urinary tract infection in March 1998, which had resolved by April 1998. (Tr. at 1005-1006, 1079-1081.) The medical record contains a faxed copy of the December 30, 1998 entry with a physician signature. The date imprinted by the facsimile machine is January 4, 1999. (State Exhibit 20, at 244.) Nevertheless, Royder acknowledged that, when only one page is faxed to the supervising physician practicing at another location, the supervising physician would not know the patient's history in order to determine whether the patient is presenting with a new condition. (Tr. at 1087-1088.)
{¶ 151} Stewart treated patient 24, an established patient, on December 9, 1998. Again, no physician was present with Stewart that day. Stewart acknowledged that patient 24 had presented with a new condition and that he had prescribed Triactin and Amoxil. The medical record contains no indication that any physician reviewed Stewart's orders. (Tr. at 219-221; State Exhibit 24, at 4A.)
{¶ 152} On December 30, 1998, Stewart treated patient 41, a four-year-old child who had suffered from cold symptoms over the past week. Again, no physician saw or examined the child. After his examination, Stewart diagnosed pharyngitis. He prescribed Rondec DM, Z-max, Tylenol elixir, and chewable vitamins. A medical assistant initialed the entry indicating that the medications and prescriptions had been given to the patient. In addition, the patient was given a tuberculosis vaccination in the left forearm. (Tr. at 315-317; State Exhibit 41, at 5B.) The medical record contains a fax copy of Stewart's entry with Royder's signature. The fax is dated January 4, 1999. (Tr. at 317; State Exhibit 41, at 6.)
{¶ 153} On December 28, 1998, Stewart treated patient 46, an established patient to Ryder's practice. Patient 46 was a young child with complaints of right ear pain, difficulty hearing, vomiting, and difficulty breathing. Although the symptoms were of recent onset, no physician saw or evaluated this patient. Stewart examined the child and diagnosed bilateral acute otitis media. He prescribed Zithromax, Rondec DM, and Tylenol elixir. The list of medications was bracketed, with the letter "D" and the initials of a medical assistant. Stewart testified that the medications he recommended had been "possibly" dispensed to the patient. (Tr. at 319-321; State Exhibit 46, at 14A.) However, in earlier testimony, Stewart stated that when an entry contains a "D" next to the list of medications, it indicates that the medication had been dispensed to the patient. (Tr. at 262.) The medical record contains a fax copy of Stewart's entry which contains Royder's signature. It is clear from the fax copy that the entry was faxed to Royder with the medical assistant's initials and the "D" already documented. (Tr. at 321; State Exhibit 46 at 14.) Royder maintained before the Board that Stewart had not treated a new condition, reasoning that patient 46 had been suffering from recurrent otitis media. This was based upon Royder's claim that the child had ear infections in June, and August, of 1998. Royder acknowledged, however, that no physician had diagnosed recurrent otitis media. On cross-examination, Royder also admitted that he had not had the entire medical record when Stewart's entry was faxed to him as the supervising physician. At that point, Royder changed his testimony to state that he had known that patient 46 had not presented with a new condition because the office protocol precluded Stewart from treating patients with new conditions. (Tr. at 1089-1090.)
{¶ 154} Stewart treated patient 50 on May 8, 1998. Patient 50 was a 39-year-old female complaining of pain in the left thumb for the past three weeks. She had been seen in the emergency room six days earlier for similar complaints. The records show that in March 1998, patient 50 had been seen in Royder's clinic complaining of pain in her thumb. The physician who examined her in March had ordered an x-ray and diagnosed contusion of the left hand. (Tr. at 325-327; State Exhibit 50 at 21A.) Stewart examined patient 50 and diagnosed her with tendonitis of the left thumb. He then called in prescriptions for Ansaid and Fioricet to a pharmacy and advised the patient to apply ice to her thumb and return to the clinic if there was no improvement. The medical record contains a fax copy of Stewart's entry with the addition of Royder's initials. The entry indicates that Stewart's original entry had been faxed to Royder with the medications already initialed by office staff. (Tr. at 325-327; State Exhibit 50 at 21A, 22.)
{¶ 155} Royder argued that Stewart had not treated a new condition on May 8, 1998, because a physician in his practice had previously diagnosed a contusion in the left thumb. He reasoned that the injury had become chronic, and the diagnosis had changed from contusion to tendonitis. Therefore, although the diagnosis had changed, it was still the same condition. (Tr. at 1016-1017.)
{¶ 156} Stewart treated patient 53 on December 29, 1998. Patient 53 presented for follow-up of a miscarriage eight days earlier. She also requested an evaluation for sexually transmitted diseases and requested a refill of Daypro. Stewart examined patient 53 and diagnosed vaginitis with a history of asthma. Stewart testified that he was uncertain as to whether the vaginitis was of recent onset, but noted that she had had a diagnosis of cervicitis seven months earlier. Stewart prescribed Flagyl, Miconazole, Mylanta, Proventil inhaler, and Flovent inhaler. He noted that the initials of a medical assistant next to the order for Flagyl indicate that patient 53 had received Flagyl. (Tr. at 329-333; State Exhibit 53 at 17A.)
{¶ 157} Royder again argued that Stewart had not treated a new condition. He testified that patient 53 had presented with the condition of recurrent vaginitis. Royder stated that patient 53 had numerous visits in the past for the same complaint. He referred to a visit in June 1998, when patient 53 had been diagnosed with cervicitis, and a visit in October 1997, when she had been diagnosed with a yeast infection. (Tr. at 1019-1020.) When asked if cervicitis, vaginitis, and a yeast infection are all the same thing, Royder stated "not exactly." He went on to explain:
{¶ 158} "What I have encountered with working with different doctors is that instead of using a specific diagnosis which is reached by doing a specific examination, they will shortcut the process and just give a diagnosis of a condition so that they can be done with the patient, done with that situation, and they can go on to the next patient. They will just give the patient a diagnosis, give the patient treatment and not do the pelvic examination. And that's what I am including [sic] that occurred on this visit because of the chronicity recurrence of that same issue with this patient." (Tr. at 1019-1020.)
{¶ 159} He later added cervical herpes, genital herpes, and pelvic inflammatory disease to the list of diagnoses made by previous treating physicians. Royder acknowledged that the various "diagnoses" would not all be treated in the same manner but, nevertheless, argued that they are all the same "condition." (Tr. at 1020-1022.)
{¶ 160} When asked if the miscarriage eight days earlier had been a new condition, Royder testified that it had not been. He testified that he believed that this patient must have been seen in the emergency room, apparently insinuating that a physician must have examined the patient for that condition prior to Stewart's having treated her. Royder based his conclusion that this patient had been seen in the emergency room upon his belief that a woman could not conclude, on her own, that she had suffered a miscarriage. (Tr. at 1090-1091.)
{¶ 161} Stewart treated patient 54 on December 29, 1998. This patient complained of hives and itching, as well as daily menstruation since December 1, 1998. Stewart examined this patient and diagnosed anxiety, urticaria, and dysfunctional uterine bleeding secondary to Depo Provera administration. Stewart prescribed a Zoloft starter kit, Vistaril, BuSpar, Diprolene cream and Depo Provera (pills). No physician saw patient 54 that day. (Tr. at 333-335; State Exhibit 54 at 23A.) The record contains a fax copy which is identical to the original entry but for the addition of Royder's initials. The date imprinted by the facsimile machine is December 30, 1998. (Tr. at 335-336; State Exhibit 54 at 24.)
{¶ 162} Royder argued that Stewart had not treated a new condition as he had in fact treated dysfunctional uterine bleeding secondary to Depo Provera which had first manifested itself in November 1997. (Tr. at 1023; St. Ex. 54 at 19A, 23A.) Royder was then questioned concerning Stewart's prescribing Zoloft, a new medication, Vistaril, BuSpar, and Diprolene Cream, and explained that Stewart had prescribed those medications for the conditions of anxiety and urticaria. When asked if anxiety and urticaria were new conditions, Royder testified that these were not new conditions because this individual had complained of urticaria and hives in July 1995. (Tr. at 1023; State Exhibit 54 at 16A, 23A.) When asked again for a previous diagnosis of anxiety, Royder explained that seven years earlier, patient 54 had been diagnosed with neurodermatitis and hives, which Royder explained is a symptom of having an anxiety disorder. Therefore, Stewart's prescribing of Zoloft, a medication used in the treatment of depression, had been appropriate for the condition of neurodermatitis as diagnosed in 1991. Royder also referred to other incidents in the medical record, including a prescription for Desyrel for depression in February 1988. Again, Royder concluded that Stewart's prescribing Zoloft in 1998 had been appropriate for treatment of the condition of depression, last noted ten years earlier. Royder did not address the fact that Stewart had not diagnosed depression. (Tr. at 1023-1026; State Exhibit 54 at 14A, 23A.)
{¶ 163} Stewart treated patient 55 on May 15, 1998. Patient 55 complained of coughing and nasal congestion. Stewart diagnosed an upper respiratory infection and prescribed Rondec drops. The record contains a fax copy of the original chart but for Royder's signature. The fax copy reveals two dates imprinted by the facsimile machine: July 2, 1995 and May 18, 1998. (Tr. at 337; State Exhibit 55 at 13A, 14.)
{¶ 164} Stewart treated patient 59 on December 9, 1998, while practicing without on-site supervision. This patient was a ten-year-old boy who thought he had noticed worms in his stool the prior evening. Stewart examined this individual and diagnosed enterobiasis. He then prescribed Vermox. Stewart acknowledged that patient 59 had presented with a new condition. There is no indication in the record that a physician saw patient 59 or reviewed Stewart's order. (Tr. at 234-235; State Exhibit 59 at 7A.)
{¶ 165} Stewart saw patient 66 on December 29, 1998. Patient 66 complained of nasal drainage for one week, and Stewart diagnosed sinusitis. He prescribed Claritin D, a Z-pack, and amitriptyline, and ordered a sinus x-ray. Stewart testified that that the initials of the medical assistant indicated that the prescriptions had been given to the patient. The record contains a fax copy of Stewart's original entry but for Royder's signature. Stewart stated that, according to office protocol, it would appear that the prescriptions had been given to the patient prior to the entry being faxed to Royder. (Tr. at 344-345; State Exhibit 66 at 79A, 80.)
{¶ 166} Stewart treated patient 73 on December 9, 1998, while practicing without supervision. This individual complained of nausea, diarrhea, and cramps, and was diagnosed with gastroenteritis. Stewart prescribed Tigan, Bactrim DS, and Immodium. The medical record contains no indication that a physician reviewed Stewart's orders. (Tr. at 245-248; State Exhibit 73 at 18A.) Royder argued that Stewart had not treated a new condition that day, claiming that the condition which had caused the patient's symptoms had indicated recurrent vaginitis, rather than the gastroenteritis diagnosed by Stewart.
{¶ 167} Stewart treated patient 81 on December 29, 1998, while practicing alone. This patient complained of diabetes, right arm pain, and low back pain. Stewart performed an examination and diagnosed lumbosacral sprain and strain, as well as degenerative joint disease. Stewart testified that, on a visit in September 1998, a physician had diagnosed low back pain. However, no physician had diagnosed lumbosacral sprain and strain. Stewart ordered physical therapy to treat the condition and testified that the physical therapy order had been carried out because it had been initialed by a medical assistant. The entry contains no indication that a physician saw patient 81 or reviewed Stewart's orders. (Tr. at 254-258; State Exhibit 81 at 36A.)
{¶ 168} Stewart examined patient 83, a seven-year-old child, on December 30, 1998. Stewart diagnosed a respiratory infection and prescribed Rondec DM, Amoxil, and chewable vitamins. Stewart testified that the medications had been given to the patient. There is no physician signature on the original entry; however, there is a fax copy with Royder's initials. The fax copy is imprinted with the date January 4, 1999. (Tr. at 346; State Exhibit 83 at 5B.)
{¶ 169} Stewart treated patient 87 on June 17, 1998. This patient complained of a stye in her right eye. She also requested a diabetes checkup. Stewart listed his diagnostic impressions as diabetes mellitus, type II, increase in lipids, and chalazion (stye), right eye. He acknowledged that the record contained no prior complaint of a stye. Stewart advised the patient to apply warm compresses to her eye. In addition, he dispensed samples of medications. Stewart also advised the patient to return to the clinic the following day to pick up her prescriptions. There is no indication that a physician saw or examined patient 87. (Tr. at 349; State Exhibit 87 at 5B.) Royder argued that patient 87 had not been treated for a new condition, but that Stewart had in fact treated the established condition of diabetes mellitus. Royder explained the connection between diabetes mellitus and a stye, as follows:
{¶ 170} "[Royder]: The pathophysiology of diabetes causes an increase in skin infections and chronicity recurrence of these skin infections, which can be mostly in the feet, which is well-known as a very, very profound problem, but there can be recurrent skin lesions allover the body which can manifest in different ways, including chalazions.
{¶ 171} "* * *
{¶ 172} "[Royder]: * * * [Y]ou can get other skin infections which are, I call, recurrent cellulitis or can exacerbate into recurrent inclusion cysts, which is like a form of acne, a simple way to say that, that can be in the skin allover the body.
{¶ 173} "[Examiner]: And diabetics have a tendency towards this?
{¶ 174} "[Royder]: Yes. They have a very profound propensity towards this and chronicity with this.
{¶ 175} "[Examiner]:And that's related to styes?
{¶ 176} "[Royder]: Styes are in this category. A stye is a specific diagnosis of a pimple, if you will, that happens to be on the eyelid.
{¶ 177} "[Examiner]: And diabetics have a higher tendency towards getting styes?
{¶ 178} "[Royder]:They have a higher tendency towards any kind of skin infection, which that includes styes, chalazions." (Tr. at 1033-1036.)
{¶ 179} Royder later testified that the stye was a new diagnosis, but part of the preexisting condition of diabetes. (Tr. at 1101-1102.) However, in his earlier deposition, Royder had simply testified that the chalazion was a new condition. Additionally, Royder had made no mention of patient 87's diabetes as the established condition related to her stye. When Royder was confronted with his deposition testimony, he stated that he disagreed with his prior testimony and his own use of the word "condition." Royder explained that the word condition had been first used by Mr. Katko, the Board's attorney. Therefore, Royder argued that his use of the word condition had been influenced by Mr. Katko. In the end, however, Royder acknowledged that Mr. Katko had not used the word "condition" in the question presented at that time. (Tr. at 1102-1107; State Exhibit 128 at 79-80.)
{¶ 180} Stewart treated patient 94 on December 29, 1998. This individual complained of drainage and burning from her right eye and requested medication refills. Stewart performed an examination and diagnosed anxiety, depression, and conjunctivitis. He prescribed Elavil, Paxil, Zyrtec, and Sulamyd. Stewart testified that conjunctivitis was a new condition for which he had prescribed Sulamyd. He further testified that, based on office protocol, the fact that a medical assistant had initialed the Sulamyd would indicate that the medication had been given to the patient. (Tr. at 358-360; State Exhibit 94 at 128.)
{¶ 181} Stewart saw patient 95 on December 29, 1998. At that time, he diagnosed bronchitis and nicotine dependence. Accordingly, he prescribed Claritin D, Tessalon, and Trovan. The medical record contains a fax sheet which is identical to the original but for a change in Royder's initials. There is no indication that a physician saw or examined this patient. (Tr. at 360-361; State Exhibit 95 at 14B, 16A, 17.)
{¶ 182} Stewart examined patient 97 on December 29, 1998. Patient 97 stated that he had recently been hospitalized for chest pain, fainting spells and an irregular cardiac rhythm. The patient further reported that he had a "heart checkup" on December 23, 1998, and that no abnormalities had been reported. Stewart performed an examination and ordered a chest x-ray, a Holter monitor, and scheduled an echocardiogram. Finally, Stewart diagnosed syncope and anxiety/depression. He prescribed Zoloft, although this patient had had no prior diagnoses of anxiety or depression. The record contains a fax copy signed by Royder. The date imprinted by the facsimile machine is December 30, 1998. There is no indication that any physician saw or examined patient 97. (Tr. at 363-364; State Exhibit 97 at SA, 6.)
{¶ 183} Stewart examined patient 104 on December 29, 1998. This individual complained of upper back pain following a fall from a ladder. Patient 104 reported that he had x-rays taken at the hospital, which had revealed two compression fractures, one at T8 and the other in his upper back. Stewart performed an examination and listed diagnoses of dorsal lumbosacral sprain and strain, as well as a history of compression fracture. Stewart prescribed Phrenilin Forte and recommended an orthopedic or neurologic appointment. The initials of a medical assistant appear next to the order for Phrenilin Forte. The record contains a facsimile page which indicates that Stewart's entry was faxed to Royder with the initials of the medical assistant already documented. The date imprinted by the facsimile machine is December 30, 1998. There is no evidence that any physician saw and examined this patient. (Tr. at 365-366; State Exhibit 104 at 7A.) At the hearing, Royder testified that the patient's condition was chronic back pain. Royder further testified that the new compression fracture could be added to his overall condition of chronic back pain. Therefore, Royder concluded once again that Stewart had not treated a new condition. (Tr. at 1046-1047.)
{¶ 184} Stewart treated patient 105 on December 9, 1998, while practicing without on-site supervision. Patient 105 complained of coughing and congestion and requested an appointment for a mammogram the following Thursday. Stewart prescribed Z-max and Allegra D, and samples of these medications were dispensed to the patient. There is no evidence that this patient was examined by a physician. Moreover, the medical record contains no indication that a physician reviewed Stewart's orders. (Tr. at 263-265; State Exhibit 105 at 13A.)
{¶ 185} During the course of his hearing, Royder maintained that he had instructed Stewart that he was not to issue prescriptions or dispense medications under any circumstances. (Tr. at 731-732.) Nevertheless, during his February 1999 deposition, Royder clearly testified that Stewart had been allowed to refill patients' maintenance medications without consulting the supervising physician, unless he first determined that the medications needed some adjustment. When asked to explain the discrepancy between his two statements, Royder explained that it was a semantics issue, and that the meaning of the words had been "different" at the deposition. (State Exhibit 127 at 94.)
{¶ 186} Counsel for the Board then referred Royder's attention to another portion of the deposition, during which he had testified that he had authorized Stewart to issue prescriptions for continuing medications for controlled substances without prior approval by a physician. Indeed, Royder had testified regarding the detailed instructions and limitations he had set forth for Stewart when he was prescribing medications and controlled substances. However, at the hearing, Royder maintained that Stewart had not issued prescriptions, but that he had only made "recommendations." (Tr. at 734-736; State Exhibit 127 at 100-103.)
{¶ 187} Finally, Royder was referred to deposition testimony, in which he had testified that Stewart was to use his "clinical judgment" in determining whether a prescription was appropriate for a patient's problem. He was also asked regarding his earlier testimony that if there was evidence of abuse by the patient, Stewart was not to prescribe a controlled substance. (Tr. at 737-739; State Exhibit 127 at 103-105.) Stewart testified that, regarding medications that the patient took over a long period of time, the policy at Royder's clinics was that he was authorized "to recommend in the medical record that the patient maintain that medication." Stewart added that all recommendations in the medical record were reviewed by the physician prior to the medications being dispensed or ordered. (Tr. at 267-269.) However, this testimony contradicted the testimony which Stewart gave during his deposition. During his deposition, Stewart testified that he had been authorized to issue prescriptions for medications that had been previously prescribed by a physician without first receiving authorization from Royder. (State Exhibit 118 at 37.) Additionally, Mr. Beck testified that Stewart had admitted to him that Stewart had been authorizing prescriptions for controlled substances without physician approval. (Tr. at 855-856; State Exhibit 143.)
{¶ 188} Stewart saw patient 3 on December 30, 1998, while practicing unsupervised. Stewart prescribed Dilantin, Prempro, Claritin, and Cefzil. The patient record contains no signature of a physician, either an original or a faxed entry. (Tr. at 208-211; State Exhibit 3 at SA.)
{¶ 189} Stewart saw patient 4 on June 30, 1998, while Royder was out of town and while working unsupervised. Stewart testified that his supervising physician was Dr. Perez. Stewart prescribed Trovan. In the patient's file, there is an "S" followed by Stewart's initials next to the medication. The entry is countersigned only by Royder. There is no indication that Dr. Perez reviewed the entry. (Tr. at 287-288, 290-291; State Exhibit 4 at 4A.)
{¶ 190} Patient 7 was examined by Stewart on December 9, 1998. At this time, Stewart prescribed Daypro. No physician examined patient 7, and there is no physician signature in the entry. (Tr. at 299-301, 304, 640, 1064-1065; State Exhibit 7 at 7B.) Royder stated that Stewart had "evaluated the patient, checked off by fax with his supervising physician, and the supervising physician [had given] him direction on what he was to do." However, he was forced to admit that nothing in the patient record supported his conclusion. (Tr. at 640-641.)
{¶ 191} Patient 8 was seen by Stewart on July 2, 1998. Stewart prescribed Augmentin. The entry reveals the name and telephone number of a pharmacy and the initials "RE" next to the medication. No physician signed the entry other than Royder, who was on vacation at the time of patient 8's visit. (State Exhibit 8 at 238.)
{¶ 192} Stewart treated patient 10 on July 2, 1998, while working unsupervised. Stewart prescribed Plavix, Daypro, vitamins, Robitussin DM, and Cefzil. The patient file contains the initials of a medical assistant and the name of a pharmacy. Stewart testified that the entry indicates that the prescriptions had been called to the pharmacy. (Tr. at 307-308; State Exhibit 10 at 3B.) A pharmacist also testified that the medications had been called to the pharmacy and were prepared for dispensation to the patient on July 2, 1998. (Tr. at 782-784; State Exhibit 130.)
{¶ 193} Stewart treated patient 16 on June 16, 1998, and prescribed Capsin. The record contains a note that the medication order had been faxed to "TSMC pharmacy," followed by Stewart's initials. There is no physician signature in the entry, and no indication that a physician reviewed Stewart's order. (Tr. at 278-280; State Exhibit 16 at 9B.)
{¶ 194} Stewart examined patient 17 on December 29, 1998, while unsupervised. Stewart prescribed Daypro and Medrol Dosepak. The medical record contains no indication that a physician ever reviewed Stewart's orders. (Tr. at 212-217; State Exhibit 17 at 6A.) Royder acknowledged that no physician had countersigned Stewart's entry. He also testified that the medical assistant's initials for this entry do not appear next to the medication but, rather, next to the x-ray. Therefore, he claimed that there is no way to determine if this patient had received the medications ordered by Stewart. (Tr. at 644, 648, 1078.) Despite their inability to determine whether medications had been ordered, pharmacy logs indicate that the medication orders had been presented to the pharmacy on December 29, 1998. (Tr. at 651-652; State Exhibit 124.)
{¶ 195} Stewart treated patient 19 on June 30, 1998, and prescribed Amoxil, Zyrtec and Zoloft. In the patient record, the medications are bracketed with Stewart's initials. Stewart stated that the entry indicates that samples of these medications had been dispensed to the patient. (Tr. at 309-310; State Exhibit 19 at 118.)
{¶ 196} Stewart saw patient 20 on December 30, 1998, while practicing without supervision. Stewart prescribed Cipro, and the medical record contains a faxed copy of Stewart's entry with a physician's signature. The date imprinted by the facsimile machine is January 4, 1999. (Tr. at 312-315; State Exhibit 20 at 818, 244.)
{¶ 197} Stewart examined patient 24 on December 9, 1998, while working unsupervised. At that time, Stewart prescribed Triactin and Amoxil. The record contains Stewart's initials next to the list of prescribed medications which indicates that Stewart gave the prescriptions to the patient. The medical record contains no indication that any physician reviewed his orders. (Tr. at 219-221; State Exhibit 24 at 4A.)
{¶ 198} Stewart treated patient 27 on June 26, 1998, and prescribed Phrenilin, Dilantin, Tritec, Levbid, and vitamins. In the record, the list of medications are bracketed and initialed "RB." A pharmacist testified that the medication orders had been called to the pharmacy that day by someone named "Rod" on behalf of Royder. There is no physician signature on the entry and no fax copy associated with this entry. (Tr. at 820-827; State Exhibit 138; State Exhibit 27 at 70B.)
{¶ 199} Stewart saw patient 39 on July 1, 1998, and prescribed Indocin and Ultram. In the record, the medications are bracketed, with the name and phone number of a pharmacy, and the initials "DE." A pharmacist testified that the medication order had been called to the pharmacy by a Diana on behalf of Royder. The only physician signature on the entry is that of Royder, who was on vacation on July 1, 1998. (Tr. at 827-831; State Exhibit 139.)
{¶ 200} Stewart saw patient 41 on December 30, 1998, while practicing without on-site supervision. Stewart prescribed this patient Rondec DM, Z-max, Tylenol elixir, and chewable vitamins. In addition, Stewart ordered a tuberculosis vaccination, which was administered in the left forearm. The medical record contains a fax copy of an entry with Royder's signature. The fax is dated January 4, 1999. (Tr. at 315-317; State Exhibit 41 at 58, 6.)
{¶ 201} Stewart treated patient 52 on July 2, 1998, and prescribed Darvocet N-100, Corgard, Dilantin, Zoloft, Claritin D, Daypro and Skelaxin. The first four medications are bracketed with the initials of a medical assistant and a pharmacy phone number. Stewart testified that it appears that those four prescriptions were called to a pharmacy. The last three medications are bracketed with the initials of a medical assistant and the letter "S." Stewart testified that it appeared that samples of these three drugs had been dispensed. The entry contains Royder's signature. As stipulated by the parties, Royder would have signed the entry when he returned from his vacation. There are no other physician signatures related to that entry. (Tr. at 327-329, 744-745; State Exhibit 52 at 45A.) A pharmacist testified that she had prepared the Darvocet N-100, Zoloft, and Corgard for distribution to patient 52 on July 2, 1998. The pharmacist further testified that she had prepared the medications based on a telephone order from someone who had identified himself as Royder. (Tr. at 807-811; State Exhibits 135, 136 and137.)
{¶ 202} Stewart treated patient 54 on December 29, 1998, and prescribed a Zoloft starter kit, Vistaril, BuSpar, and other medications. The medical record contains a fax copy bearing Royder's initials. The date imprinted by the facsimile machine is December 30, 1998. (Tr. at 333-336; State Exhibit 54 at 23A, 24.)
{¶ 203} Stewart examined patient 55 on May 15, 1998, and prescribed Rondec drops. The medical record contains a fax copy of the original with Royder's signature. The fax copy reveals two dates imprinted by the facsimile machine: July 2, 1995, and May 18, 1998. (Tr. at 337; State Exhibit 55 at 13A, 14.)
{¶ 204} Stewart examined patient 56 on December 30, 1998, while practicing unsupervised. Stewart prescribed Baycol, Zyrtec, BuSpar, and Benztropine. The medical record contains a fax copy bearing Royder's signature. The date of that fax is January 4, 1998. (Tr. at 338-341; State Exhibit 56 at 73B, 74.)
{¶ 205} Stewart saw patient 58 on May 15, 1998, and prescribed Allegra D, Nasonex inhaler, and Tylenol #3 (a narcotic analgesic). The medications were dispensed to the patient. (Tr. at 341-342; State Exhibit 58 at 9.) Patient 58 was again seen by Stewart on July 1, 1998. At that time, Stewart discontinued the Allegra D and Amoxil and prescribed Fioricet and BuSpar. The entry contains initials of a medical assistant and the name of a pharmacy. Stewart testified that it would appear that the prescriptions had been called to the pharmacy. The medical record contains no evidence that any physician reviewed Stewart's entry prior to Royder's return from vacation on July 5, 1998. (Tr. at 342-343; State Exhibit 58 at 10B.)
{¶ 206} Stewart examined patient 63 on July 1, 1998, and prescribed a number of medications, including Zoloft and Vistaril. The medications are bracketed with the name and telephone number of a pharmacy and the initials "RE." The only physician initials in the entry are those of Royder who was on vacation and out of town at that time. (State Exhibit 63 at 12A.) The pharmacist from the location listed in the entry testified that the pharmacy's computer records document that the pharmacy had prepared Zoloft for dispensation to the patient on July 1, 1998. Moreover, he stated that the medication was prepared based on an order presented to the pharmacy from Royder's office. (Tr. at 837-845; State Exhibit 142.)
{¶ 207} Stewart examined patient 64 on July 2, 1998, and prescribed Nix, Elimite, and Vistaril. The list of medications is bracketed, with the name of a pharmacy and the initials "RE." The only physician signature is that of Royder, who was on vacation at the time of the visit. (State Exhibit 64 at 23B.) A pharmacist from the location noted in the patient's record testified that someone named Rod from Royder's clinic had called the pharmacy and ordered the medication for the patient on behalf of Dr. Perez. (Tr. at 774- 784; State Exhibit 129.)
{¶ 208} Patient 67 was seen by Stewart on July 1, 1998. At that time, Stewart prescribed Darvocet N-100, Elavil, Zoloft, an Albuterol inhaler, and Zyrtec. The medications are bracketed with the name and number of a pharmacy and the initials "DE." There is no counter signature other than that of Royder who had been out of town that day. (Tr. at 746; State Exhibit 67 at 448.) A pharmacist from the location listed in the entry testified that he had prepared Darvocet N-100 [a controlled substance], Elavil, Zoloft, an Albuterol inhaler, and Zyrtec for patient 67 on July 1, 1998. The pharmacist further testified that he had prepared the medications based on an order from a Diana at Royder's office. (Tr. at 831-834; State Exhibits 140, 141.)
{¶ 209} Stewart examined patient 71 on June 17, 1998, and prescribed Zyrtec. The name and telephone number of a pharmacy and the initials "RE" appear in the patient record next to the medication, and Royder's initials are the only physician initials in the entry. However, Royder was out of town that day. (State Exhibit 71 at 6A; Joint Exhibit I.) Similarly, Stewart saw patient 73 on December 9, 1998, and prescribed Tigan, Bactrim DS, and Immodium. Examination of the patient's medical record contains no indication that a physician reviewed Stewart's orders. (Tr. at 245-248; State Exhibit 73 at 18A.) The same is true for patient 74 who Stewart examined on December 9, 1998. While he approved a refill for Zyrtec, no physician was practicing with Stewart on that day, and the evidence shows that no physician was consulted or reviewed his order. (State Exhibit 74 at 58.)
{¶ 210} On December 28, 1998, Stewart treated patient 77 and prescribed Tylenol #3 (a narcotic analgesic), Clonidine, Climara, Norvasc, and Hydrochlorothiazide. These medications are bracketed with the name and telephone number of a pharmacy and the initials "SP." There is no evidence that a physician reviewed Stewart's orders. (Tr. at 249-254; State Exhibit 77 at 43A.)
{¶ 211} Stewart saw patient 80 on July 1, 1998, and prescribed Prozac, increasing the dosage from 20 mg. to 40 mg. daily. The patient record shows that Royder signed off on this order even though he was out of town that day. (State Exhibit 74 at 128.) Concerning patient 83, Stewart examined this individual on December 30, 1998, and prescribed Rondec DM, Amoxil, and chewable vitamins. While the medical record contains a fax copy bearing Royder's signature, Stewart testified that the medications had been dispensed to the patient prior to the time at which the entry was faxed to Royder. (Tr. at 346-349; State Exhibit 83 at 5B, 6.)
{¶ 212} Stewart examined patient 84 and ordered a Prednisolone injection, Relafen, and Phrenilin Forte (a barbiturate/narcotic analgesic). Although these medications were dispensed to the patient, the patient's medical record contains no indication that a physician reviewed Stewart's orders. (Tr. at 260-263; State Exhibit 84 at 26B.)
{¶ 213} On June 5, 1998, Stewart examined patient 88, prescribing Wellbutrin SR, Zyrtec, and multivitamins. In the patient record, the medications are bracketed, and annotated with Stewart's initials and the name and telephone number of a pharmacy. Royder countersigned the entry, despite the fact that he was out of town that day. (State Exhibit 88 at 11B; Joint Exhibit 1.) Likewise, there are two entries for patient 95. Both were completed by Stewart while working unsupervised that day. (State Exhibit 95 at 16A, 17, 18.) In the first entry, Stewart prescribed Claritin D, Tessalon, and Trovan. In the second entry, Stewart prescribed Elavil, Naprosyn, and Capsin. The medications are bracketed with the notation "meds given," and the original entry contains Royder's initials. In addition, there is a fax copy with Royder's initials and with the date December 30, 1998, imprinted by the facsimile machine. (State Exhibit 95 at 18, 648.)
{¶ 214} On December 30, 1998, Stewart prescribed a Medrol dose pack, Amerge, Prilosec, Arthrotec, Claritin and Nicorette gum to patient 96. Next to the list of medications is the name of a pharmacy and the initials "SF." While the medical record contains a fax sheet, it is dated January 4, 1999. (Tr. at 361-363; State Exhibit 96 at 32A, 33.) The day before, on December 29, 1998, Stewart was practicing without on-site supervision when he prescribed patient 97 Zoloft. (Tr. at 363-364; State Exhibit 97 at SA.)
{¶ 215} Patient 99 was seen by Stewart on June 19, 1998, when he ordered an injection of allergy extract and prescribed Zyrtec. The initials "RB" appear next to the injection. The name of a pharmacy and the initials "RB" appear next to the prescription for Zyrtec. However, no physician signed the entry, and there is no fax copy of the entry in the patient's medical record. (State Exhibit 99 at 17A.) Similarly, on October 20, 1998, Stewart prescribed patient 100 Ultram and Naprosyn. However, there is no physician signature in the entry, and no fax copy in the medical record. (State Exhibit 100 at 4B.)
{¶ 216} On June 29, 1998, Stewart treated patient 102 and prescribed Flexeril. Again, there is no signature of a physician, and there is no fax copy in the medical record regarding this treatment. (State Exhibit 102 at 248.) Pharmacy records indicate that the prescription for Flexeril was prepared for dispensation to patient 102 on June 29, 1998, based on a telephone call from someone at Royder's clinic. (Tr. at 794-799; State Exhibit 133.) Stewart treated patient 102 again on July 2, 1998, at which time he prescribed Phrenilin (a barbiturate analgesic). The name of a pharmacy is recorded in the entry, with the initials "RE." There is no signature of a physician, and there is no fax copy in the medical record. (State Exhibit 102 at 25A.) Pharmacy records indicate that the prescription was filled on July 2, 1998, based on a telephone call from someone at Royder's clinic calling on behalf of Royder. (Tr. at 800-807; State Exhibit 131.)
{¶ 217} Patient 105 was given Z-max and Allegra D by Stewart on December 9, 1998. Again, there is no evidence that a physician reviewed Stewart's orders. (Tr. at 263-265; State Exhibit 105 at 13A.) In addition to the patients addressed above, the following patients were seen by Stewart. However, their records also contain no evidence that they were seen by a physician or that Stewart's conduct was supervised by a supervising physician. For example, Stewart examined and treated patient 2 on June 30, 1998. Royder signed the entry, despite the fact that Royder had been out of town on that date. (Tr. at 283-287; State Exhibit 2 at 45A.) Stewart examined and treated patient 5 on June 30, and again on July 1, 1998. Royder's signature is the only physician signature on the entries, despite the fact that Royder had been out of town on those dates. (State Exhibit 5 at 31A, 32A.)
{¶ 218} Stewart examined and treated patient 9 on July 1, 1998. Again, Royder's signature is the only physician signature on the entry despite the fact that he had been out of town on that date. (State Exhibit 9 at 41.) Stewart also examined and treated patient 14 on June 29, 1998. Royder's signature is the only physician signature on the entry, despite the fact that he had been out of town on that date. (State Exhibit 14 at 78.) Stewart examined and treated patient 18 on June 30, 1998. Royder again signed the patient record, although he had been out of town on that date. (State Exhibit 18 at 78.)
{¶ 219} Stewart saw patient 22 on June 29, 1998, while practicing without supervision that day. He prescribed Fioricet, Ultram, and Claritin, and the patient record contains the phone number of a pharmacy and the initials "DE." Royder's signature is the only physician signature on the entry even though he had been out of town on that date. (State Exhibit 22 at 41A.) Stewart treated patient 23 on June 30, 1998, and administered injections. Royder's signature is the only physician signature on the entry, and again, he had been out of town on that date. (State Exhibit 23 at 11A.)
{¶ 220} Stewart saw patient 25 on June 29, 1998, and ordered injections, which were administered by "RB." Royder signed the patient record although he had been out of town on that date. (State Exhibit 25 at 78.) On June 29, 1998, Stewart treated patient 25 and prescribed Phrenilin. Royder signed the entry although he had been out of town on that date. (State Exhibit 32 at 78.)
{¶ 221} Stewart saw patient 44 on June 30, 1998, and ordered injections. Royder again signed the record even though he had been out of town on that date. (State Exhibit 44 at 4B.) Stewart examined patient 55 on July 1, 1998, while working unsupervised. He ordered continuation of the medication Biaxin, which Stewart had prescribed on June 16, 1998. Royder again signed the patient record, although he had been out of town on that date. (State Exhibit 55 at 17A.) Similarly, Stewart examined and treated patient 58 on July 2, 1998, and Royder signed the entry, although he had been out of town. (State Exhibit 58 at 11A.)
{¶ 222} Stewart also treated patient 62 on December 9, 1998, and no physician signature is associated with this entry. (State Exhibit 62 at 33A.) Stewart saw Patient 65 on July 3, 1998. Stewart ordered an injection, which was administered by "RE." Royder signed off on the patient's record, although he had been out of town. (State Exhibit 65 at 11B.)
{¶ 223} Patient 76 was seen by Stewart on June 29, 1998, at which time he prescribed medications. Like the foregoing, Royder was the only physician who signed the patient chart, despite the fact that he had been out of town. (State Exhibit 76 at 4A.)
{¶ 224} As one can see, the list is overwhelming and, in fact, contains numerous other instances of inappropriate and illegal practice. As noted earlier, Royder entered into a supervision agreement with the Board and Stewart in August 28, 1997. According to that agreement, Royder certified that he would supervise Stewart in accordance with the terms and conditions of the Utilization Plan as approved by the Board. In part, that plan required that Stewart be supervised by a physician who was present with Stewart on-site ninety-nine percent of the time, with the supervising physician available by beeper, telephone, or cellular phone during the one percent of the time when there was not on-site supervision. It also provides that new patients be seen only when the supervising physician was on-site, and that both new patients, and established patients with new conditions, be personally seen and evaluated by the supervising physician prior to the initiation of any treatment.
{¶ 225} Despite Royder's protestations to the contrary, the evidence clearly demonstrates to this court that, in direct contravention of the requirements of the Utilization Plan and Ohio law, Royder assigned Stewart to practice without on-site supervision on at least the following dates in 1998: April 6, 7, 9, 10, and 24; May 8, 13, 15, 19, and 29; June 10, 17, 19, 24, 26, 29, and 30; July 1, 2, and 3; and December 9, 28, 29, and 30. The evidence also shows that in September and November 1998, Royder assigned Stewart to practice without on-site supervision during portions of at least eight Friday afternoons. On all of these dates and occasions, Stewart examined, diagnosed, issued prescriptions for medications, including narcotics, barbiturates, and other dangerous drugs, and made recommendations and/or treated patients. Royder also failed to provide on-site supervision when Stewart examined new patients on June 26, December 28, and December 29, 1998.
{¶ 226} Royder also failed to personally see and evaluate the following patients who presented with new conditions, and who were treated by Stewart without supervision:
{¶ 227} Patient Date New condition: Diagnosis: Treatment
{¶ 228} 4 06-30-98 Fever, low back pain: UTI: Trovan
 {¶ 229} 4 07-01-98 Low back pain, vomiting, diarrhea: UTI, possible pylonephritis: Unasyn IM, Tigan IM
 {¶ 230} 7 12-09-98 Fell from tree: dorsal/lumbar contusion: Daypro, no gym for one week
{¶ 231} 8 07-02-98 Dog bite: Augmentin
 {¶ 232} 10 07-02-98 Cough for two days: bronchitis: Plavix, Cefzil, Robitussin DM
 {¶ 233} 17 12-29-98 Fell down stairs: acute LSSS: Daypro, Medrol, Physical Therapy
 {¶ 234} 19 06-30-98 Pain in left ear: left acute otitis media: Arnoxil, Zyrtec, Zoloft
{¶ 235} 20 12-30-98 Sharp pain right side: UTI: Cipro
 {¶ 236} 41 12-30-98 Pharyngitis: Z-max, Tylenol Elixir, Rondec DM
 {¶ 237} 46 12-28-98 Vomiting, right ear pain: acute otitis media: Z-max, Rondec
 {¶ 238} 50 05-08-98 Pain left thumb x 3 weeks: tendonitis left thumb: Advised to ice thumb and return if no improvement
 {¶ 239} 53 12-29-98 Vaginitis, miscarriage: dysfunctional uterine bleeding: Flagyl, Miconazole
 {¶ 240} 54 12-29-98 Menstruation every day since 12/01/98: dysfunctjonal uterine bleeding: Depo Provera
{¶ 241} 59 12-09-98 Worms in stool: Enterobiasis: Vermox
 {¶ 242} 68 12-29-98 Fever, left ear pulling: acute otitis media: Rondec, Amoxil, Tylenol
 {¶ 243} 73 12-09-98 Gastroenteritis, suspect UTI: Tigan, Bactrim DS, lmmodium
 {¶ 244} 87 06-17-98 Stye in right eye: Advised to put compress on right eye Conjunctivitis: Sulamyd ophthalmic
{¶ 245} 94 12-29-98 Conjunctivitis: Sulamyd ophthalmic
 {¶ 246} 104 12-29-98 Patient fell from ladder: Injured back: Phrenelin
{¶ 247} The record also clearly demonstrates that Royder allowed Stewart to prescribe narcotics and other controlled substances and prescription drugs, in contravention of Ohio law, the Physician Utilization Plan, and without physician supervision. These include:
{¶ 248} Patient Date New condition: Diagnosis: Treatment
{¶ 249} 52 07-02-98 Darvocet N-100
{¶ 250} 67 07-01-98 Darvocet N-100
{¶ 251} 77 12-29-98 Tylenol #3
{¶ 252} 81 12-29-98 Tylenol #3
{¶ 253} 3 12-30-98 Dilantin and Cefzil
{¶ 254} 4 06-30-98 Trovan
{¶ 255} 7 12-09-98 Daypro
{¶ 256} 8 07-02-98 Augmentin
{¶ 257} 10 07-02-98 Daypro, Plavix, and Cefzil
{¶ 258} 11 12-29-98 Claritin D, and Z-pack
{¶ 259} 17 12-29-98 Daypro, and Medrol
{¶ 260} 19 06-30-98 Amoxil, Zyrtec, Zoloft
{¶ 261} 20 12-30-98 HCTZ, Glynase, Prempro, Monopril, and Cipro
{¶ 262} 24 12-09-98 Amoxil
{¶ 263} 27 06-26-98 Phrenelin, Dilantin, Tritec, and Levbid
{¶ 264} 39 07-01-98 Indocin, and Ultram
{¶ 265} 41 12-30-98 Rondec DM, and Z-max
{¶ 266} 47 12-30-98 Amoxil, and Clariton
 {¶ 267} 52 07-02-98 Dilantin, Zoloft, Clariton, Daypro, and Skelaxin
{¶ 268} 53 12-29-98 Flagyl
{¶ 269} 54 12-29-98 Zoloft, Vistaril, and BuSpar
{¶ 270} 55 05-15-98 Rondec
{¶ 271} 56 12-30-98 Baycol, Zyrtec, BuSpar, and Benztropine
{¶ 272} 58 05-15-98 Allegra D
{¶ 273} 58 07-01-98 Allegra D, Amoxil, Fioricet, and BuSpar
{¶ 274} 59 12-09-98 Vermox
{¶ 275} 63 07-01-98 Zoloft, and Vistaril
{¶ 276} 64 07-02-98 Vistaril
{¶ 277} 66 12-29-98 Claritin D, and Amitriptyline
{¶ 278} 67 07-01-98 Elavil, Zoloft, and Zyrtec
{¶ 279} 71 06-17-98 Zyrtec
{¶ 280} 73 12-09-98 Tigan, and Bactrin DS
{¶ 281} 74 12-09-98 Zyrtec
{¶ 282} 77 12-28-98 Clonidine, Climara, Norvasc, and HCTZ
{¶ 283} 80 07-01-98 Prozac
{¶ 284} 83 12-30-98 Rondec DM, Amoxil
{¶ 285} 84 12-09-98 Phrenilin, and Relafen
{¶ 286} 88 06-05-98 Wellbutrin, Zyrtec
{¶ 287} 95 12-29-98 Trovan, Claritin D, and Tessalon
 {¶ 288} 96 12-30-98 Medrol, Amerge, Prilosec, Arthrotec, and Claritin
{¶ 289} 97 12-29-98 Zoloft
{¶ 290} 99 06-19-98 Zyrtec
{¶ 291} 100 10-20-98 Ultram
{¶ 292} 102 06-29-98 Flexeril
{¶ 293} 102 07-02-98 Phrenilin
{¶ 294} 105 12-29-98 Z-max, and Allegra D
{¶ 295} The record also shows that Royder failed to review and sign Stewart's medical orders for patients 3, 7, 16, 17, 24, 27, 30, 43, 59, 60, 62, 73, 74, 77, 81, 84, 99, 101, 102, and 111, all whom were seen by Stewart while he was practicing without supervision on June 16, June 19, June 26, June 29, July 2, December 9, December 29, and December 30, 1998. Moreover, Royder failed to review and approve Stewart's entries and treatment for patients 16, 100, 103, 108, and 110 on May 21, June 25, August 12, September 18, December 20, 1998, and January 8, 1999. Even more telling, Royder failed to review and approve, within the required 24-hour period, a multitude of Stewart's medical orders and treatment, covering patients 2, 4, 5, 8, 9, 10, 12, 14, 15, 18, 19, 20, 21, 22, 23, 25, 32, 39, 41, 44, 47, 48, 52, 55, 56, 58, 63, 64, 65, 67, 76, 78, 80, 83, 88, 89, 92, 96, 107, and 112, which were all seen and treated by Stewart while practicing without any supervision.
{¶ 296} At its meeting on July 12, 2000, the Board unanimously adopted the findings of fact and conclusions of law rendered by the Board's hearing examiner. After detailing even more evidence than this court herein, the hearing examiner and Board stated their conclusions that the violations committed by Royder were egregious, of the most serious nature, and warranted the severe sanction of permanent revocation of his medical license. As summarized by the hearing examiner:
{¶ 297} "The evidence presented at hearing clearly demonstrates that Dr. Royder utilized a physician assistant in violation of Ohio law. Moreover, the evidence suggested that Dr. Royder did so in order to increase the number of clinics he could operate at one time, despite not having a sufficient number of physicians in his employ to practice at each of the clinics.
{¶ 298} "Furthermore, Dr. Royder allowed Mr. Stewart to practice as though he were a physician in utter disregard of patients' well-being. Not only does a physician assistant not have the training and education necessary to practice as a physician, but Dr. Royder allowed Stewart to practice unsupervised even though Dr. Royder believed that Mr. Stewart's practice was, at times, inappropriate and below the standard of care.
{¶ 299} "The law is clear that once a violation of R.C. 4731.22(B) has been found, the Board may impose sanctions ranging from dismissal to permanent revocation. The evidence presented in this matter unquestionably supports the numerous violations found. Moreover, Dr. Royder demonstrated that he is not willing to comply with the laws governing the practice of osteopathic medicine and surgery in this State. Most significantly, however, Dr. Royder demonstrated that, when he is caught for such violations, he will resort to artifice and deceit to conceal his misconduct.
{¶ 300} "Dr. Royder's untruthful responses at hearing indicate that Dr. Royder is not amenable to any meaningful regulatory relationship with the Board." (Report and Recommendation, p. 75.)
{¶ 301} Indeed, the hearing examiner and the Board concluded that Royder authorized Stewart to practice in a manner inconsistent with the Utilization Plan in a number of ways, including the following. First, it is beyond dispute that Stewart was allowed to practice without on-site supervision more than one percent of the time. Although Royder maintains that he cannot be held to this requirement because it is not "clearly defined," the hearing examiner concluded that he "did not even present a conceivably reasonable explanation as to how Stewart's practice without on-site supervision had complied with the requirement. In fact, Royder's testimony as to how he calculated the number of patients seen by Stewart with and without on-site supervision was absurd," as highlighted by his April 1998 request for permission to use Stewart without on-site supervision. While this strongly indicates that Royder was aware that his proposed use of Stewart would contravene the Utilization Plan, he nevertheless proceeded to assign Stewart to work without on-site supervision. Indeed, after he received a response from the Board, which included the minutes of the Board's discussion clearly identifying the potential violations of the Utilization Plan, Royder continued to use Stewart in the manner in which he saw fit.
{¶ 302} Based upon the evidence, the Board also found that Royder knowingly allowed Stewart to examine and treat patients new to his practice despite the fact that no physician had seen these patients. Royder also permitted Stewart to examine and treat patients who, although established patients, presented with new conditions. On this issue, Stewart testified that Royder's policy provided that the physician assistant could see an established patient who presented with a new condition, even if no physician was practicing on-site with the physician assistant.
{¶ 303} On the issue of Royder's credibility and integrity, the Board and hearing examiner found many of his arguments, claims, and explanations to be "preposterous." For example, Royder argued that a patient's cough of two days' duration was not a new condition, but merely a symptom of her previously diagnosed organic heart disease and syncope. He reasoned that she must have suffered from congestive heart failure, although that had never been diagnosed; nor had any symptoms been recorded because congestive heart failure can be a part of organic heart disease. During later, inconsistent testimony, however, Royder argued that the cough had resulted from the patient's previously existing, but undiagnosed, condition of emphysema. Another noted example centered upon Royder's rationalization that a patient's new compression fracture, the result of falling from a 14-foot ladder six days earlier, could be considered part of the previously established condition of chronic back pain. He provided similar testimony regarding another patient's acute lumbosacral strain, resulting from falling down a flight of stairs two days earlier, claiming that the condition was actually the result of an established, but undiagnosed, condition of arthropathy. As the basis for this conclusion, Royder pointed to the patient's previous complaints of shoulder pain, tiredness, and irritability, which he reasoned were symptoms of the condition of arthropathy. Therefore, the established condition of arthropathy could have caused the patient to fall down the stairs and injure his back. However, what the hearing examiner and Board found even more troubling was that Royder would formulate such an argument after previously admitting that this patient had presented to Stewart with a new condition.
{¶ 304} Regarding Royder's testimony regarding his scheme of supervision by facsimile, this also was found not credible. First, it contradicted Stewart's testimony that the supervising physician routinely failed to review his orders while the patient was at the clinic or, in fact, even within 24 hours of the patient visit. Moreover, nearly every fax copy that was produced by Royder was dated a number of days past the patient visit. Further, many of the entries contained initials indicating that someone had carried out the order prior to the entry ever having been faxed to a supervising physician. Simply put, the hearing examiner and the Board found Royder to have testified in a dishonest and unbelievable manner, as nothing in the medical records supports Royder's testimony as to the faxing protocol allegedly used at his clinics.
{¶ 305} The Board also found no merit to Royder's claims that Stewart had been supervised by either Dr. Roy or Dr. Perez in June and July of 1998. In her report, the hearing examiner wrote that Dr. Roy clearly and believably testified that he had not supervised Stewart on any occasion when Stewart was not working with him. In addition, Dr. Perez also testified that he had not supervised Stewart, or received faxed requests for approval of treatment from Stewart.
{¶ 306} In an attempt to counter this testimony, Royder claimed that he had removed all evidence of Dr. Perez's supervision in an effort to reduce the amount of paper in the patients' medical records. However, this claim is clearly suspect in light of the fact that many of the faxes frequently remained in other patients' records despite Royder's review as a "medical director." Indeed, not one fax from Dr. Perez remained in any medical record produced or reviewed at Royder's hearing. Moreover, as the evidence later confirmed, both Royder and Stewart testified during their depositions that Stewart routinely prescribed medications without prior authorization from a physician. When confronted with this prior testimony, Royder argued that it should not be considered because he had not understood the use of the word "prescription."
{¶ 307} Pursuant to R.C. 119.12, any party adversely affected by an order of an administrative agency may appeal the order of that agency to the appropriate court of common pleas. Unless otherwise provided by law, when considering the appeal, the trial court is limited to the record as certified to it by the agency. In reviewing an order of the State Medical Board of Ohio, having considered the certified record, and the merits of the appeal, the court must affirm the order of the Board if it finds that the order is supported by reliable, probative, and substantial evidence. R.C. 119.12; Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619; State Med. Bd. of Ohio v. Murray (1993),66 Ohio St.3d 527; Hayes v. State Med. Bd. of Ohio (2000),138 Ohio App.3d 762.
{¶ 308} During the course of conducting our review of the trial court's ruling upon factual issues, the primary question is whether the common pleas court abused its discretion in finding the administrative decision not to be supported by reliable, probative, and substantial evidence. Franklin Cty. Bd. of Commrs. v. State Emp. Relations Bd. (1993), 92 Ohio App.3d 585, 588. In Lorain City Bd. of Edn. v. State Emp. Relations Bd. (1988), 40 Ohio St.3d 257, the Ohio Supreme Court explained:
{¶ 309} "In reviewing an order of an administrative agency, an appellate court's role is more limited than that of a trial court reviewing the same order. It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. The appellate court is to determine only if the trial court has abused its discretion." Id. at 260-261. In Huffman v. Hair Surgeon, Inc. (1985),19 Ohio St.3d 83, the Ohio Supreme Court stated:
{¶ 310} "* * * We have repeatedly held that `[t]he term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Steiner v. Custer (1940), 137 Ohio St. 448 * * *; Conner v. Conner (1959), 170 Ohio St. 85 * * *; Chester Township v. Geauga Co. Budget Comm. (1976), 48 Ohio St.2d 372. * * *' State v. Adams (1980),62 Ohio St.2d 151, 157-158 * * *; Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
{¶ 311} " `[A]n abuse of discretion involves far more than a difference in * * * opinion * * *. The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an "abuse" in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. * * *' State v. Jenkins (1984), 15 Ohio St.3d 164, 222. " Id. at 87.
{¶ 312} The fact that the court of appeals, or this court, might have arrived at a different conclusion than did the administrative agency is immaterial. Appellate courts must not substitute their judgments for those of an administrative agency or a trial court absent the approved criteria for doing so. Loraine City Bd. of Edn. v. State Emp. Relations Bd., supra. This is particularly true when reviewing an order of the State Medical Board of Ohio, which is a board that possesses special expertise. In such a case, the reviewing court must accord due deference to the Board's interpretation of the ethical and legal requirements governing the practice of the medical profession.
{¶ 313} In Pons, supra, the Board suspended the license of a physician for violating R.C. 4731.22(B)(6), (14), and (15) by engaging in a sexual relationship with a patient. On appeal, the Ohio Supreme Court determined that since a medical disciplinary proceeding is a special statutory proceeding conducted by twelve people, eight of whom are licensed physicians, a majority of the board possess the specialized knowledge necessary to determine the acceptable standard of general medical practice. See id. at 623. The court concluded that the Board is capable of "interpreting technical requirements of the medical field and quite capable of determining when conduct falls below the minimum standard of care." Id. at 623. The court also explained that the Board was well within its statutory authority and had the discretion to weigh the evidence and determine that the physician had violated the ethics code. Id.
{¶ 314} Similarly, as this court explained in Gladieux v. Ohio State Medical Bd. (1999), 133 Ohio App.3d 465, in State Med. Bd. of Ohio v. Murray, supra, the Ohio Supreme Court affirmed the decision of the Board revoking a physician's license to practice medicine based upon his conduct of prescribing anabolic steroids to patients to enhance their athletic ability. In that case, the physician argued that prior to the effective date of Ohio Adm. Code 4731-11-05, there were no medical standards regarding steroid use. In response, the court determined that the comprehensive decision-making power of the Board includes "the authority to rely on the board's own knowledge when making a decision rather than looking to the record for the opinion of an expert." Murray at 533. As demonstrated by the Pons and Murray cases, the board may impose sanctions against conduct that has the potential for harming the public.
{¶ 315} The issue presented in this case is whether the trial court abused its discretion when it found that the Board's revocation is supported and based upon reliable, probative, and substantial evidence. Despite appellant's attempt to convince this court otherwise, his first through sixth assignments of error ask the court to overturn, on an abuse of discretion standard, the trial court's conclusion that the Board acted within its province when it determined that the evidence and argument appellant presented was not credible, nor worthy of belief. Based upon our exhaustive review of the record, we are unable to find any indication that the trial court abused its discretion, nor are we inclined to attempt to substitute our judgment for that of the hearing examiner or the Board, who were obviously in the best position to evaluate the demeanor of the witnesses, and to evaluate their credibility, which is essentially what this matter turns upon. See Lorain City Bd. of Edn. v. State Emp. Relations Bd. and Pons, supra.
{¶ 316} Specifically, we find that the trial court properly concluded that Royder violated R.C. 4730.02(E). Royder's conduct in this matter clearly constitutes the "[f]ailure of a physician supervising a physician assistant to maintain supervision in accordance with the requirements of Revised Code Chapter 4730, and the rules adopted under that chapter, as that clause is used in R.C. 4731.22(B)(32)." For example, R.C. 4730.21(D) provides:
{¶ 317} "A patient new to a physician's practice may be seen by a physician assistant only when a supervising physician is on the premises, except in those situations specified in a standard or supplemental utilization plan under which the presence of a physician is not necessary. A patient new to a physician's practice or an established patient of a physician with a new condition shall be seen and personally evaluated by a supervising physician prior to initiation of any treatment plan proposed by a physician assistant for the new patient or the established patient's new condition. * * *
{¶ 318} "Each time a physician assistant writes a medical order, the physician assistant shall sign the form on which the order is written and record on the form the time and date that the order is written. When writing a medical order, the physician assistant shall use forms that clearly identify the physician under whose supervision the physician assistant is authorized to write the order. The supervising physician named on the order shall review each medical order written by the physician assistant not later than twenty-four hours after the order is written, unless the supervising physician's utilization plan specifically authorizes a longer period of time for review. After reviewing an order, the supervising physician shall countersign the order if the supervising physician determines that the order is appropriate. Countersignature by the supervising physician is necessary before any person may execute the physician assistant's order, except in situations in which a patient requires immediate attention and any other circumstances specified in a supplemental utilization plan under which countersignature is not necessary. The supervising physician shall review each medical order executed without countersignature not later than twenty-four hours after the order is written."
{¶ 319} Moreover, Royder's almost non-existent supervision of Stewart constitutes numerous violations of R.C. 4730.21(D). Royder's conduct, as set forth in the hearing examiner's findings of fact, also constitutes "violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of, or conspiring to violate, any provisions of this chapter or any rule promulgated by the board." R.C. 4731.22(B)(20), Ohio Adm. Code 473l-4-03(A) and (8). Ohio Adm. Code4731-4-03 provides in part:
{¶ 320} "The physician's assistant shall not perform functions or acts including, but not limited to, the following:
{¶ 321} "(A) Make a diagnosis of a disease or ailment or the absence thereof independent of the employing physician;
{¶ 322} "(B) Prescribe any treatment or a regimen not previously set forth by the employing physician[.]"
{¶ 323} We also conclude that the trial court acted within its discretion when it affirmed the Board's finding that Royder's conduct in this matter constituted "violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of, or conspiring to violate, any provisions of this chapter or any rule promulgated by the board," as that clause is used in R.C. 4731.22(B)(20), and Ohio Adm. Code4731-4-03(C), which provides that a physician assistant shall not "[p]rescribe medication * * * or dispense or order medication." The evidence presented at hearing is replete with examples of Stewart prescribing or dispensing medications to patients without prior physician authorization. Indeed, Royder's claims that Stewart's medication orders had not actually been carried out was repeatedly refuted by evidence from pharmacies and testimony given by pharmacists.
{¶ 324} Royder's conduct, as set forth by the hearing examiner in findings of fact A(1) and A(2), constitutes "violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of, or conspiring to violate, any provisions of this chapter or any rule promulgated by the board." R.C. 4731.22(B)(20) and 4731.43
(practice of osteopathy without certificate). Moreover, Royder's behavior as outlined in findings of fact A(2)(a) constitutes the "[c]ommission of an act that constitutes a felony in this state * * *" as that clause is used in R.C. 4731.22(B)(10). To wit: R.C. 2923.03, complicity, and R.C.2925.03, trafficking in drugs. Specifically, R.C. 2925.03(A) provides that no person, excepting licensed practitioners whose conduct is in accordance with Chapters 3719, 4715, 4729, 4731, and 4741, or R.C. 4723.56
shall knowingly sell or offer to sell a controlled substance.
{¶ 325} The Ohio Supreme Court has determined that the unlawful prescribing of a controlled substance constitutes a "sale" pursuant to R.C. 2923.03.1, and Ohio Adm. Code 4731-4-03(C), provides unequivocally that it is unlawful for a physician assistant to prescribe, order, or dispense any medication. State v. Sway (1984), 15 Ohio St.3d 112. Nevertheless, the evidence demonstrates that Royder approved of Stewart's writing prescriptions without prior approval from any physician. Indeed, Stewart's orders were routinely transmitted to pharmacies from Royder's clinics by Royder's employees. Royder reviewed and signed Stewart's entries as a supervision physician and medical director of the clinics. Moreover, during the course of his deposition, Royder admitted that he had authorized Stewart to issue prescriptions for controlled substances without prior approval by a physician.
{¶ 326} Finally, R.C. 2925.23 provides that no person shall knowingly make a false statement in any prescription, order, report, or record required by Chapters 3719 or 4729 of the Revised Code. It further provides that no person shall intentionally make, utter, or sell, or knowingly possess a false or forged: (1) prescription; (2) uncompleted preprinted prescription blank used for writing a prescription; or (3) official written order.
{¶ 327} We agree with the trial court that the evidence is overwhelming in support of the Board's decision to revoke appellant's license to practice medicine in this state.
{¶ 328} For the foregoing reasons, appellant's first through sixth assignments of error are overruled, his seventh assignment of error is moot, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
BRYANT and DESHLER, JJ., concur.